UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
*********************************************
PABLO ROSA,                         *      CIVIL ACTION NO:
              Plaintiff.            *      3:00CV1367 (RNC)
                                    *
VS.                                 *
                                    *
TOWN OF EAST HARTFORD;              *
OFFICER WILLIAM PROULX, ET AL       *
              Defendants.           *      NOVEMBER 12, 2003
*********************************************
```

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
## TO MOTION FOR SUMMARY JUDGMENT

### I.    INTRODUCTION

The incident which is the subject matter of this lawsuit occurred on Thanksgiving,

November 26, 1998, at 140 Silver Lane in East Hartford, Connecticut at around 7:00 p.m.

Mr. Rosa's Complaint alleges false arrest and excessive force in the use of a police canine,

Bruno, by certain of the defendant police officers, primarily Bruno's handler, William Proulx,

as well as the arresting officer, Francis McGeough, in violation of the 4th and

14[th]Amendments to the United States Constitution, as enforced by 42 U.S.C. § 1983, and of

the corresponding provisions of the Connecticut Constitution, directly.

Additionally, the Complaint alleges that the Defendant, Town of East Hartford, was

deliberately indifferent to the civil rights of Mr. Rosa in that it failed to establish policies and

effectuate any meaningful oversight, supervision or discipline of its police officers, in

1

connection with mishandling of canines when apprehending suspects.  As such, it is alleged that Officer Proulx, who had a long and problematic prior history of mishandling of his canine, was essentially given free reign by the Defendant, East Hartford police department, to continue such pattern of conduct, undisciplined and unabated.

Mr. Rosa further alleges that as a result of such policies, the muscle and soft tissue in his left calf, which was bitten by the police canine, Bruno, unprovoked, for a prolonged period of time, including while being handcuffed, outside of the presence or control of his handler, Officer Proulx, were essentially "ripped off", requiring several days of hospitalization, and extensive skin graft surgery, resulting in permanent deformity and disability to his left leg, as well as related clinical depression and anxiety and loss of dignity.

## II.    FACTS VIEWED IN THE LIGHT MOST FAVORABLE TO THE PLAINTIFF

1.    On Thursday, November 26, 1998, the Plaintiff, Pablo Rosa (hereinafter "the Plaintiff" or "Pablo Rosa") was having Thanksgiving dinner with friends and acquaintances at the home of Jesus Santana and his wife at 25 Bond Street, Apartment 3, East Hartford, Connecticut.  Santana Tr. at 12.

2.    Some time before 7:00 p.m., the males there, namely, Fernando Rivera (who lived with his father, Angel Rivera, and his brother, Jaime Rivera, in Apartment C-10, 140 Silver Lane, East Hartford, Connecticut, diagonally across from Apartment C-17), Jesus

Santana and Felix Rivas, decided to drive to the Rivera apartment to get dominoes to bring back with them.  Santana Tr. at 13,14; Fernando Rivera Tr. at 15-16, 22; Rosa Tr. at 32.

3.     Pablo Rosa reluctantly came along for the ride.  Santana Tr. at 61; Rosa Tr. at 31.

4.     Although Pablo Rosa wanted to stay in the car, Jesus Santana talked him into going upstairs with the others. Id.

5.     When they arrived at 140 Silver Lane, they went upstairs to the third floor. Santana Tr. at 16.

6.     Upon arriving on the third floor, they saw Jaime Rivera, who went ahead of them, in the hallway.  He was arguing with persons from Apartment C-17.  Santana Tr. at 16; Fernando Rivera Tr. at 30.

7.     Shortly thereafter, certain occupants of Apartment C-17, namely, Alicia Nance and Felicia Oliver, entered the hallway and the argument continued, primarily between Jaime Rivera and certain occupants of Apartment C-17.  Santana Tr. at 16.

8.     The other occupants of Apartment C-17 remained inside the apartment, with the door open, during the argument.  Santana Tr. at 27.

9.     The complainants, Alicia Nance (also known as "Buffy") and Felicia Oliver, who were sisters and who resided in Apartment C-17, were part of the group, as were Alicia Nance's boyfriend, Kenneth Hardy, and their young daughter.  Belinda Jewell and Antwain Allen were also present in Apartment C-17, as well as other children.  Oliver Tr. at 9-12

10.    As part of the Thanksgiving Day celebration, the adults in Apartment C-17, including the complainants, had been watching football on television and drinking beer. Oliver Tr. at 116.

11.    About a week earlier, Jaime Rivera, who lived in Apartment C-10, who had been assaulted by Kenneth Hardy and thrown down a stairwell in the apartment building, had reported the incident to the police, who arrested Mr. Hardy in Apartment C-17 in the middle of the night while he was with Alicia Nance, and then booked him at the police station. Oliver Tr. at 15-16; Nance Tr. at 33-38.

12.    While the previously referenced argument was going on, Pablo Rosa was standing next to the metal fire door, away from the argument. Rosa was not involved in the argument. Santana Tr. at 19, 27, 52; Rosa Tr. at 42.

13.    Nobody in the hallway during the argument had a gun, and therefore, a gun was never found. Santana Tr. at 23-24; Fernando Rivera Tr. at 32-33; Rosa Tr. at 37-38.

14.    There was no physical contact between or among any participants in the argument at any time that evening. Nance Tr. at 63-64; Oliver Tr. at 83-85; Fernando Rivera Tr. at 32-33; Rosa Tr. at 62.

15.    Two 911 calls were made to the police. The first, by Alicia Nance, did not mention a gun. First 911 Call Transcript at 1.

16.    The second call, made by Felicia Oliver, referred to the possibility that one of the members of the group in the hallway might have a gun, although none was reportedly

4

seen. See First and Second 911 Calls Transcripts; attached hereto as "Exhibit 1"; Oliver Tr. at 19, 34; Nance Tr. at 39.

17.     After these 911 phone calls were made, until the police arrived, the occupants of Apartment C-17 continued to keep their apartment door open and talk face to face with members of the group in the hallway.  Oliver Tr. at 20-23; Fernando Rivera Tr. at 33.

18.     Nobody from Apartment C-17 let the police into the building upon their arrival.  Nance Tr. at 6.

19.     Shortly after the arrival of the police at 140 Silver Lane, canine Bruno, unleashed and unattended, came in through a door down the hall from those who were standing near Apartment C-17, near a metal fire door.  Santana Tr. at 33, 42.  Rosa Tr. at 48-50; Fernando Rivera Tr. at 35; Jaime Rivera Tr. at 41-42.  No officer was present or announced himself.  Id.

20.     The persons in the hallway scattered.  Santana Tr. at 33, 52; Jaime Rivera Tr. at 41-42.

21.     The door to Apartment C-17 was then closed, with the occupants inside. Santana Tr. at 34-36.

22.     Fernando Rivera, the only person whom the complainants identified as having a gun, went into Apartment C-10 at that time, where he resided.  Santana Tr. at 34, 51; Oliver Tr. at 31, 33, 34

23.    Jesus Santana stood still near the wall near Apartment C-10, watching.
Santana Tr., at 33, 34.

24.    Pablo Rosa turned to the fire door near him. Id. at 34-36.

25.    At that time canine Bruno, still unattended, attacked Pablo Rosa and bit him on
his left calf while he attempted to escape through the fire door. Santana Tr. at 34-36, 52;
Oliver Tr. at 37; Rosa Tr. at 48-50.

26.    Police officers were holding the fire door shut so Pablo Rosa could not escape
from the police canine. Id.; Santana Tr. 33-34.

27.    After some period of time, canine Bruno released his bite on Pablo Rosa then
rebit him through a torn jean. Santana Tr. at 35-36;

28.    Pablo Rosa did not resist. Rosa Tr. at 73-74.

29.    The bite seemed to Pablo Rosa and Jesus Santana, who was watching close by,
to last up to five minutes. Santana Tr. at 39; Rosa Tr. at 100-101.

30.    Pablo Rosa was screaming and bleeding on the hallway floor between the fire
door and the two apartment doors. Santana Tr. at 53-54, Proulx Tr. at 128.

31.    Eventually Officer McGeough entered the hallway and handcuffed Pablo Rosa
while canine Bruno was still biting him. Santana Tr. at 37-38.

32.    Officers on the scene proclaimed, when the Plaintiff asked them to direct
canine Bruno to disengage his bite, that "he must be hungry". Santana Tr. at 43.

33.    Officers also stated that the "fucking Puerto Ricans" had "messed up [their] Turkey Day." Santana Tr. at 43, 58.

34.    A big stain of blood was visible on the carpet in the hallway. Santana Tr. at 55.

35.    Officer McGeough testified, contrary to testimony of numerous other witnesses, that Pablo Rosa was bitten for only three to five seconds maximum, and made no sound; that he saw no evidence of injury or bleeding of any kind, and that he wasn't even sure if he had even been injured or bitten as he was handcuffing him. McGeough Tr. at 125-129.

36.    Officer Proulx testified contrary to the testimony of numerous other witnesses, that Pablo Rosa was bitten only after holding the fire door shut from the side of it opposite to the side the Plaintiff testified he was on, and that the Plaintiff was charged with cruelty to animals as he was observed attempting to kick canine Bruno at the end of the entire incident "simultaneous to" the five to ten seconds he was being bitten. Proulx Tr. at 127-128.

37.    Officer Proulx testified that he peeked through the fire door to see this happen. Id.

38.    Pablo Rosa, who required extensive skin grafts from his thigh and several days of hospitalization, was transported to the hospital in handcuffs and then handcuffed to his bed there. Santana Tr. at 59-60.

39.    Pablo Rosa was charged with breach of peace and interfering with a police officer in relation to his supposed conduct of fighting in the hall and running from Officers

Proulx and McGeough, when told to stop.  (Criminal Tr. at 3-4, attached hereto as "Exhibit 2").

40.    The cruelty to animals charge stemmed from the brief alleged conduct already described, which was separate, distinct and subsequent to the conduct underlying the other charges.  Proulx Tr. at 127-128.

41.    Before trial, the State, of its own accord, nolled the cruelty to animals charge.  ("Exhibit 2, supra").

42.    Subsequent thereto, in the middle of his court trial, the Plaintiff pled guilty to breach of peace and the interfering with a police officer charge was then dismissed in conjunction with that plea.  Id.

43.    Officer Proulx, for the five years prior to this incident, had been involved in 33 known prior dog bite cases, as opposed to three on the part of the town's other canine officer, Robert Kornfeld, during that same period.  (See Affidavit, of David K. Jaffe, Esq., attached hereto as "Exhibit 3").

44.    Past cases involved repeated patterns of fact whereby Officer Proulx used his police canine to bite and hold unarmed and/or nonviolent suspects, sometimes while they were still handcuffed.  Id.

45.    A police canine is one of many weapons available to a police officer.  (See Allard Report at 8, attached hereto as "Exhibit 4").

46.    Use of a police canine falls on the scale of continuum of force somewhere between use of a billy club (a/k/a nightstick or baton) and use of a gun. Allard Tr. at 43-44; "Exhibit 4", supra, at 8.

47.    Police forces must have canine policies in place which effectively monitor mishandling of canines in apprehending suspects in order to identify mishandling officers, promote citizen safety, and adjust tactics in the field, where appropriate. Wicks Tr. at 140-146; "Exhibit 4", supra, at 10; Allard Tr. at 123-124.

48.    Related investigation into such conduct therefore, must be serious and complete investigations that are followed up on where canine mishandling is found or suspected. Id. See also Chief Shay Tr. at 102-103.

49.    Despite his referenced past incident profile, Officer Proulx has never been monitored, sanctioned, reprimanded or disciplined for any prior incidents involving a police canine. "Exhibit 3".

50.    Department canine policy, or lack thereof, and appropriateness of canine handling and tactics in the field, were never reviewed. Leonard Tr. at 32; "Exhibit 5" at 7-10; Allard Tr. at 23-24. Wicks Tr. at 236-238; 248-251.

51.    The only policy in place pertaining to police canines related primarily to their care and presented no guidelines or protocol to the officers in the field as to their use in apprehending suspects. Leonard Tr. at 32. See also General Order 41.02.17, attached here as "Exhibit 5"; See also "Exhibit 4", supra, at 8; Allard Tr. 123-124.

52.    Additionally, the East Hartford police department, officially utilized the General Order investigations, merely to document injuries. Regardless of the results, it had a related official policy of filing the reports away, with no followup, unless a citizen's complaint was filed. Leonard Tr. at 31-32; 46-47; Chief Shay Tr. at 51.

53.    In the present case, proper police work would dictate an objective, thorough investigation of what occurred and proper followup. "Exhibit 5", supra at 8; Chief Shay Tr. at 28, 35-36; Leonard Tr. at 28.

54.    Despite divergent eyewitness versions of events, only two witnesses (the complainants from Apartment C-17) were interviewed for the purposes of the General Order investigation, which report, in any event, was filed *before* theses witnesses were interviewed, in violation of the General Order and good police practice. Leonard Tr. at 28-29; Chief Shay Tr. at 40-41.

55.    The victim was not interviewed, even though the General Order requires an investigation to include witness and victim interviews. See "Exhibit 5", supra; Leonard Tr. at 28-29; Wicks Tr. at 231; Chief Shay Tr. at 40-41; Incident reports attached hereto as "Exhibit 6".

56.    Sergeant Leonard had no training in conducting such General Order investigations. Leonard Tr. at 33.

57.    With regard to the previous thirty-three pre-morbid General Order investigations of Officer Proulx, where dog bites occurred, the majority contained no witness

statements, and no photographs of injuries, and only one contained a statement from the victim, despite General Order requirements. "Exhibit 5", supra; Leonard Tr. at 28-29; Wicks Tr. at 231; Chief Shay Tr. at 40-41.

58.    Not one General Order report was ever followed up on by the East Hartford police department, including the numerous instances where victims filed lawsuits alleging wrongdoing and injuries. "Exhibit 3", supra.

**59.**    There was no General Order investigation of the dog bite sustained by Jaime Rivera on the evening of November 26, 1998, as required. Leonard Tr. at 54.

## III.    LAW & ARGUMENT

## A.    STANDARD

In a summary judgment motion, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). A court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." Miner v. City of Glens Falls, 999 F.2d 655, 661 (2d Cir. 1993) (citation omitted). A dispute regarding a material fact is genuine " 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." ' Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 523 (2d Cir. 1992) (quoting Anderson, 477 U.S. at 248). After discovery, if the nonmoving party "has failed to make a sufficient showing on an

essential element of [its] case with respect to which [it] has the burden of proof," then

summary judgment is appropriate.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)

The Court resolves "all ambiguities and draw[s] all inferences in favor of the

nonmoving party in order to determine how a reasonable jury would decide." Aldrich, 963

F.2d at 253. Thus, "[o]nly when reasonable minds could not differ as to the import of the

evidence is summary judgment proper." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir.

1991); see also Suburban Propane v. Proctor Gas, Inc., 953 F.2d 780, 788 (2d Cir. 1992).

**B.**     **The Disputed Factual Predicate underlying the Plaintiff's Excessive Force
Claim Precludes Summary Judgment**

Mr. Rosa has pleaded facts that readily establish a claim of unreasonable or excessive

force used by the Defendants in violation of his Constitutional Rights secured by the Fourth

and Fourteenth Amendments and 42 U.S.C. §1983.[1]

The Defendants argue that the actions of Officers Proulx and McGeough were

objectively reasonable under the circumstances and, therefore, they are shielded from liability

by the doctrine of qualified immunity.  The defense of qualified immunity requires a finding

that a police officer's actions were objectively reasonable in light of the clearly established

---

[1] Plaintiff does not contest, at this time, that he does not have a valid claim under the Fifth
Amendment as incorporated by the Fourteenth Amendment. Plaintiff maintains that he has a valid
claim under the Fourth and Fourteenth Amendments, and based on excessive force in violation of his
right to due process.

law related to the incident giving rise to the alleged Constitutional infringement. Saucier v.
Katz, 533 U.S. 194, 207 (2001).

At the outset, it is essential to note that the objective reasonableness inquiry is fact-
specific. Graham v. Connor, 490 U.S. at 396. If facts material to the issue of qualified
immunity are in dispute, then claims cannot be dismissed as a matter of law. DiMarco v.
Rome Hospital, 952 F.2d 661, 666 (2d Cir. 1992) (where the facts material to that inquiry
were disputed, determination of qualified immunity could not be made as a matter of law).

In this case, the Defendants have pruned facts from a large thicket of alternative
versions of facts gleaned from numerous statements and depositions, in presenting their so-
called "undisputed facts" in their Rule 9(c) Statement. Indeed, it is informative to note that in
their recitation of facts pursuant to Local Rule 9(c)(2), they reference, exclusively. the
deposition testimony of four witnesses who are generally favorable to their version of facts
namely, the two Defendant police officers and the two complainants, while conveniently
ignoring highly contradictory testimony from the Plaintiff and five supporting witnesses, as
well as additional contradictory testimony sprinkled throughout numerous other depositions.
Unfortunately for the Defendants, when one views a version of the material facts as pruned by
the Plaintiff, it is patently obvious that this current action must survive.[2]

---

[2] Statements and/or depositions were taken of approximately fifteen lay witnesses, and several expert witnesses.
The common thread running through all of these depositions is that the witnesses' versions of what happened
were divergent, contradictory and inconsistent—often internally inconsistent. If one takes as true the version of
events as proffered by testimony of witnesses supporting the Plaintiff's case, a picture is painted of clear use of
excessive force. Indeed, even the Defendants' police expert, Daniel Wicks, has admitted in his deposition, that

Moreover, even if summary judgment law were "turned on its head" and the

Defendants' version of the facts of the dog bite incident were somehow taken as true, this case

may not be dismissed, because according to the Plaintiff's police expert, Reginald Allard, the

force used on the Plaintiff by the defendant police officers in directing canine Bruno to

engage and bite Pablo Rosa was excessive even when considering the defendants' version of

facts. (Facts, ¶¶ 25-31).

C. **Favorable Termination of the Underlying Criminal Charge is not an Essential Requirement of a §1983 False Arrest or False Imprisonment Claim**

Pablo Rosa was arrested and charged with breach of peace, interfering with a police

officer and cruelty to animals. The State entered a nolle on the cruelty to animals charge

before trial. (See Rule 56(c)(2) Statement, Defendants' "Exhibit 1" at 4:24, court records,

("Exhibit 2", supra). Defendants fail to address the fact that the charge of cruelty to animals

leveled against Mr. Rosa was nolled before trial, presumably because it was so obviously

meritless. (Id.). Such a favorable termination of a criminal charge, which was based on facts

separate and distinct from the other charges, should be considered separately from these

charges. As such, summary judgment should be denied as to Mr. Rosa's false arrest claim for

cruelty to animals, apart from any ruling that the court makes as to breach of peace or

interfering.

---

the Plaintiff's witnesses' version of events, if true, demonstrates that excessive force was used. Wicks Tr. 127-128; 221

Regardless, favorable termination of criminal charges is not an essential requirement of a §1983 false arrest claim, and, therefore, summary judgment should be denied as to all false arrest claims.

### 1. The separate and distinct nature of the cruelty to animals charge preserves favorable termination as to such charge.

It is true that Pablo Rosa was convicted of breach of peace. However, the factual underpinnings for such charge occurred separately and distinctly from, and subsequent to, the nucleus of facts allegedly comprising the breach of peace and/or interfering with a police officer charges.

According to Officer Proulx, the facts concerning the alleged cruelty to animals charge were as follows: Simultaneous to Pablo Rosa being bitten for five to ten seconds, he kicked canine Bruno. (Facts, ¶ 36). As such, these acts do not spring from the acts (allegedly arguing in the hallway) comprising breach of peace to which Pablo Rosa ultimately pleaded guilty. Hence, the guilty plea as to the breach of peace does not relate to, and is not factually intertwined with, the arrest upon which the false arrest claim is based. In this instance, the charge of cruelty to animals arose out of a separate and distinct set of alleged conduct and the false arrest claim based thereon should stand. Cf. Berman v. Turecki, 885 F. Supp. 528, 532 n. 9 (S.D.N.Y. 1995) (barring false arrest claim where dismissed charges were "inextricably intertwined" with the charge of conviction); Frazier v. Woods, 1998 WL 146231, *4 (S.D.N.Y. 1998) (barring false arrest charge where plaintiff was convicted on five of 12

charges because charges were "closely related, stemming from the same facts and type of conduct.")

Consequently, even if, assuming *arguendo*, a favorable termination were a condition precedent to bringing such a claim, the Plaintiff's false arrest claim as it relates to the cruelty to animals charge would still stand. See infra, Weyant v. Okst, 101 F.3d 845, 853 (2d Cir. 1996); Singer v. Fulton County Sheriff, 63 F.3d 110 (2d Cir. 1995); Vallen v. Conelly, 36 Fed. Appx. 29, 2002 WL 1291023 (2d Cir. 2002); Breen . Garrison, 169 F.3d 152, 153 (2d. Cir. 1999).

### 2.    <u>Regardless, a favorable termination is not required in the Second Circuit to preserve a false arrest claim.</u>

The elements of false arrest under § 1983 are "substantially the same" as the elements under New York law. Byrd v. City of New York, 336 F.2d 72, 75 (2d Cir. 2003) citing Hygh v. Jacobs, 961 F.2d 359, 366 (2d Cir.1992). Therefore, the elements of a §1983 false arrest claim are (1) the defendant intended to confine the plaintiff; (2) the plaintiff was aware of the confinement; (3) plaintiff did not consent to the confinement; and (4) the defendant had no privilege to cause the confinement. See, e.g., Weyant v. Okst, 101 F.3d 845, 853 (2d Cir. 1996), discussed *infra*.

The defendants argue, erroneously, that Mr. Rosa cannot maintain his false arrest claim because there was not a favorable outcome as to the breach of peace charge. Defendants disregard a substantial body of law, including recent Second Circuit decisions,

which recognize that favorable termination of the underlying criminal charges is not an essential requirement of a §1983 false arrest claim. Weyant v. Okst, 101 F.3d 845, 853 (2d Cir. 1996); Singer v. Fulton County Sheriff, 63 F.3d 110 (2d Cir. 1995); Vallen v. Conelly, 36 Fed. Appx. 29, 2002 WL 1291023 (2d Cir. 2002); Breen . Garrison, 169 F.3d 152, 153 (1999).  The case law reveals and emphasizes the need to examine the facts and circumstances of the cases themselves and consider whether the arrest was based on probable cause, rather than summarily dismissing all claims based upon a general rule of strictly requiring favorable termination of the underlying criminal charges.

In Weyant, the police were investigating the possibility of an escape from a nearby correctional facility.  They assumed that the plaintiff was a convict, and denied him medical attention.  He was found guilty of resisting arrest.  With respect to §1983 claims, the court unequivocally stated, "favorable termination of the proceedings is not an element of this tort." Id. at 853-4 ("elements of the tort of malicious prosecution include termination of proceedings in favor of the accused, [while' it is not an element of a claim for false arrest.").  The court found that it was necessary to re-consider the issue of probable cause and make a determination as to whether there was probable cause for the arrest.

In Singer v. Fulton County Sheriff, supra, 63 F.3d 110, the court found the dismissal of the underlying criminal prosecution in "the interests of justice" was not sufficiently favorable outcome to support a malicious prosecution action, but it was enough to support an

action for false arrest. As in <u>Weyant</u>, the <u>Singer</u> court stated that favorable termination of the underlying criminal proceeding is not an element of a §1983 false arrest claim. <u>Id</u>. at 118.

The <u>Singer</u> court analyzed the issue of whether such a claim should proceed on the basis of the existence of probable cause. The false arrest claim could remain if there was no probable cause for the arrest, regardless of the outcome of the criminal matter. <u>See also</u> <u>Breen v. Garrison</u>, 169 F.3d 152, 153 (1999) (Finding the question of false arrest more appropriately evaluated by examining the existence of probable cause.)

In <u>Vallen v. Conelly</u>, 36 Fed. Appx. 29, 2002 WL 1291023 (2d Cir. 2002), the court evaluated a §1983 claim for false arrest and followed the reasoning of <u>Singer v. Fulton County Sheriff</u>, found that "termination of proceedings in favor of the accused is not an element of a claim for false arrest." <u>Id.</u> at 31. Although this holding is premised on New York law, Connecticut law is analogous to New York law in this respect. <u>See</u> <u>Russo v. City of Hartford</u>, 184 F. Supp. 2d 169 (D. Conn. 2002) (Hall, J).

A § 1983 claim for false arrest, resting on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause, <u>see</u>, e.g., <u>Lennon v. Miller</u>, 66 F.3d 416, 423 (2d Cir.1995), is substantially the same as a claim for false arrest. The existence of probable cause to arrest constitutes justification and "is a complete defense to an action for false arrest," <u>Bernard v. United States</u>, 25 F.3d 98, 102 (2d Cir.1994), whether that action is brought under state law or under § 1983. <u>See</u>, e.g., <u>Singer v.</u>

Fulton County Sheriff, 63 F.3d at 118 ("There can be no federal civil rights claim for false arrest where the arresting officer had probable cause.").

In general, probable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime. See, e.g., Dunaway v. New York, 442 U.S. 200, 208 n. 9 (1979); Wong Sun v. United States, 371 U.S. 471, 479 (1963); Brinegar v. United States, 338 U.S. 160, 175-76 (1949). The question of whether or not probable cause existed may be determinable as a matter of law if there is no dispute as to the pertinent events and the knowledge of the officers, or may require a trial if the facts are in dispute. See, e.g., Moore v. Comesanas, 32 F.3d 670, 673 (2d Cir.1994) (where since question of whether arresting officer had probable cause was "predominantly factual in nature, [it] was properly presented to the jury". The investigating officer has the duty of investigating all facts, both inculpatory and exculpatory and considering them altogether in determining whether probable cause exists. Baptiste v. J.C. Penny Co., 147 F. 3d 1242 (10th Cir. 1998); Kuehl v. Burtis, 173 F. 3d 646, 650 (8th Cir. 1999).

In the instant case, there exist myriad disputed issues of material fact as to whether probable cause existed to arrest Pablo Rosa for breach of peace, interfering and cruelty to animals.  (Facts ¶¶ 6, 12, 13, 14, 15-18, 19, 24-27).[3]

### D. **Defendants are not Entitled to Summary Judgment on the Qualified Immunity Defense**

#### 1. **Legal Standard**

As with the standard for summary judgment, the standard governing the qualified immunity defense is well settled.  "Under the doctrine of qualified immunity, a government official performing discretionary functions is shielded from liability for civil damages if his conduct did not violate plaintiff's clearly established rights or if it would have been objectively reasonable for the official to believe that his conduct did not violate plaintiff's rights." Mandell v. County of Suffolk, 316 F.3d 368, 385 (2d Cir.2003).

Accordingly, defendants are entitled to summary judgment unless, in response to defendants' motion for summary judgment, Mr. Rosa has submitted evidence sufficient to establish that objectively reasonable persons in the defendants' position would have known that their conduct violated Mr. Rosa's rights.  See also Graham v. Connor, 490 U.S. at 396, 109 ("With respect to a claim of excessive force" during arrest, in violation of the Fourth Amendment, the standard is the "reasonableness [of the particular force used] at the

---

[3] In regard to the cruelty to animals charge which was dismissed just before trial, even Officer McGeough, the arresting officer, admits that the facts as described by Officer Proulx fall short of establishing probable cause to support such charge.  McGeough Tr. at 139-140.

moment."). <u>See</u> <u>also</u> <u>Scott v. Henrich</u>, 39 F.3d 912, 914 (9th Cir.1994)("[i]n Fourth

Amendment unreasonable force cases, unlike in other cases, the qualified immunity inquiry is

the same as the inquiry made on the merits" (internal quotation marks omitted)), *cert. denied,*

515 U.S. 1159 (1995). The objective reasonableness test will not be met "if, on an objective

basis, it is obvious that no reasonably competent officer would have concluded, in that

moment that his use of force was necessary." <u>Malley v. Briggs</u>, 475 U.S. 335, 341 (1986).

### 2.      **The Use of Force was not Objectively Reasonable**

In this case, the Defendants do not contest the existence of an established

constitutional right on behalf of Mr. Rosa to be free from the use of excessive force.

(Defendants' Memorandum at 14). Therefore, the Court must proceed to second part of the

analysis, and determine whether, under an objective viewpoint, a reasonable officer should

have known that the challenged conduct violated Mr. Rosa's established constitutional right.

The Defendants rely on <u>Carey v. Cassista</u>, 939 F. Supp. 136 (D. Conn. 1996), which

they claim offers guidance because it is "the only Connecticut decision involving police

canine use of force." However, this case is readily distinguishable from the instant case on

the facts alone. Although a police canine was involved in <u>Carey</u>, that is where the factual

similarity ends.

The uncontroverted facts are as follows: The plaintiff consumed four or five beers

during the course of the day while doing work on his wife's car. They had an argument, and

the plaintiff departed in her car. He stopped at a package store and purchased more beer,

consuming two more while driving around. Meanwhile, his wife contacted the police saying he was driving while intoxicated, and provided police with the make, model and license number of her car.

Police put out a bulletin to all police in the area and plaintiff was located and pulled over by a Chester Connecticut constable. Plaintiff informed the officer that he did not have a license, but produced the registration. The officer instructed the plaintiff to remain in his car while he verified the information in his cruiser. The plaintiff seized the opportunity and fled from the car. The officer alerted State Police, who located the plaintiff. The State Trooper came upon the plaintiff, and plaintiff immediately fled. The Trooper told him to stop, or he would release his canine. The plaintiff uttered an expletive directed at the Trooper, and continued to flee. The Trooper ordered his dog to "get him," and the dog tracked the plaintiff, and ultimately seized the plaintiff.

The Trooper came upon the dog holding the plaintiff, and ordered the dog to release and set itself in the "down watch" position. The dog followed the command. The plaintiff seized yet another opportunity to flee, and did so again. The dog was able to once again apprehend the plaintiff, and as trained, it followed the command from the arresting Trooper to "release." In the process of the multiple attempts to flee, the plaintiff sustained several dog bites.

The only similarity between Carey and the instant case is that there was a police canine involved. Any effort on the part of the Defendants to rely on Carey as offering guidance for this Court should be disregarded.

Indeed, in the instant case, the Defendants' own expert has admitted that if the material facts are as stated by the Plaintiff and supporting witnesses, in his opinion, excessive force was used. Wicks Tr. supra, at 127-128; 221.

Regardless, there remain numerous disputed issues of material fact, including whether the dog was released before Officer Proulx ever entered the hallway in which the reported disturbance occurred. It is also disputed as to whether Officers Proulx and McGeough ever announced their presence and demanded that everyone lie on the ground. It remains in dispute that Officer Proulx ever uttered the infamous phrase "stop, or I will release a trained police dog" prior to releasing the dog. It is further disputed that Felicia Oliver ever exclaimed that "he's got a gun" in reference to Pablo Rosa, since all deposed occupants of Apartment C-17, including Felicia Oliver herself, and others, testified they thought Fernando Rivera, who had already run into Apartment C-10, was the one with the gun. (Facts, ¶ 22).

Additionally, the complainants testified that neither of them went downstairs to inform Officer Proulx that somebody in the hallway had a gun in their possession, contrary to the testimony of Officer Proulx. If what Officer Proulx said was true, namely, that there was a dispute between the two factions from Apartment C-17 and C-10, which he reportedly observed for about fifteen to thirty seconds upon arriving on the third floor of the 142 Silver

Lane apartment building, then this would also bring in the question whether or not there was probable cause to believe there was a gun present. This is especially true since there also didn't appear to be any apprehension of a gun on the part of the complainants, who reportedly kept their door open and continued to intermingle with the alleged "gun toter" even after Officers Proulx and McGeough, who have a duty of diligent on the scene investigation, arrived. (Facts, ¶¶15-17); Kuehl v. Burtis, 173 F. 3d 646, 650 (8th Cir. 1999) (probable cause does not exist when a minimal further investigation would have exonerated the suspect); Painter v. Robertson, 185 F. 3d 557, 571 (6th Cir. 1999) (an officer making a probable cause assessment must consider all of the information available to her, not merely that information which supports the arrest); Baptiste v. J.C. Penny Co., 147 F. 3d 1242 (10th Cir. 1998) (same).

Furthermore, if there were in fact a gun, or a reasonable apprehension of a gun, the reported conduct of following the two suspects, Jaime Rivera and Pablo Rosa, without first clearing the hallway, as well as peeking through the door to view him as he was reportedly closing the door, belies fear of the existence of a gun as well. (Facts, ¶37).

Without belaboring the point, certainly, there remain far too many material facts in issue that demonstrate that Officer Proulx's actions in releasing canine Bruno were not objectively reasonable to support a claim of qualified immunity.[4] In fact, this is true even if one

---

[4] Another material issue of fact relates to the differing witness versions of whether Pablo Rosa was involved at all in the reported argument. Pablo Rosa, Jesus Santana and Jaime Rivera, for example, emphatically deny that he was. If he were not, this fact, combined with the version of facts which does not support the evidence of probable cause in relation to unlawful possession of a firearm, presents another reason why the doctrine of qualified immunity does not apply. Facts, ¶s 3-4; 12-14.

disregards the Plaintiff, witnesses' version of events and relies solely on testimony from the Defendants and the complainants (See Facts, supra).

Cases such as Carey v. Cassista, supra, stand for the basic proposition that if police officers conduct themselves reasonably, as a matter of law, qualified immunity may be available in excessive force cases. Certainly, they do not and cannot stand for the proposition apparently advocated by the defendants, namely, that a police officer can use a police canine in any way he or she chooses, without regard to the circumstance or consequences.

In the instant case, if the canine Bruno were used in the manner reported by the Plaintiff and his supporting witnesses, no reasonably objective involved police officer could or would claim with a straight face, that he or she thought no clearly established laws were being violated.

### E.  Defendants Exhibited a Policy of Deliberate Indifference to Officer Proulx's Prior Pattern of Related Misconduct.

Defendants make the hollow argument in their Brief that there is no dispute as to the fact that the Town of East Hartford had not adopted a policy of indifference to the repeated violations of citizens' civil rights by East Hartford's canine officer, William Proulx.[5] This argument could not be more erroneous.

---

[5] Defendants' repeatedly use the terms "general" and "boiler plate" to describe Plaintiff's Monell count. In Leatherman v. Tarrant County Narcotics, 507 U.S. 163 (1993), the Supreme Court rejected a Fifth Circuit rule requiring § 1983 plaintiffs to "state with factual detail and particularity the basis for the claim" of municipal liability, because it was "impossible to square the "heightened

First, it must be noted, that from the beginning, the Defendants have resisted, every step of the way, the Plaintiff's attempts to discover past incidents and General Order investigative reports relating to Officer Proulx's extensive history of dog bite injuries occurring while he apprehends suspects. See Plaintiff's Reply to Defendant's Objection to Plaintiff's Motion to Compel Documents, dated November 7, 2002, attached hereto as "Exhibit 7" Second, it must also be noted that the Court, by Magistrate Judge Martinez's Ruling on Plaintiff's Motion to Compel, dated January 8, 2003, held that the evidence of a pattern of prior canine mishandling incidents, involving Officer Proulx, as well as whether they were properly investigated, reviewed and/or handled, were relevant to the Plaintiff's Monell claim. Accordingly, she ordered discovery of all such materials. See Ruling on Plaintiff's Motion to Compel, attached hereto as "Exhibit 8".

Pursuant to Monell theory, which focuses on a custom or practice on the part of a municipality which is the moving force behind the alleged violation of the Plaintiff's Constitutional rights, a plaintiff may proceed by proving that there has been a series of complaints of prior related misconduct to which the municipality had inadequate investigation and response. See, e.g., Vann v. City of New York, 72 F.3d 1040, 1049 (2d Cir. 1995) ("An

---

pleading standard" applied by the Fifth Circuit in this case with the liberal system of "notice pleading" set up by the Federal Rules." Id. at 168. Regardless, the discovered materials relating to a demonstrable inadequate canine policy and investigative technique failures, together with the ignoring of repeated, long standing prior canine mishandling by Officer Proulx, in apprehending suspects, elevates this case well beyond the levels of "general" or "boilerplate."

obvious need [for more or better supervision] may be demonstrated through proof of repeated complaints of civil rights violations; deliberate indifference may be inferred if complaints are followed by no meaningful attempt on the part of the municipality to investigate or to prevent further incidents."); Fiacco v. City of Rensselaer, 783 F.2d 319, 328 (2d Cir. 1986) ("Whether or not the claims had validity, the very assertion of a number of such claims put the City on notice that there was a possibility that its police officers had used excessive force."). See also, Walker v. New York, 974 Tr. 2d 293 (2nd Cir. N.Y. 1992); Carter v. Harris, 489 U.S. 378, 380 (1989).

As such, it must be emphasized that a plaintiff is generally permitted to introduce a pattern of putative misconduct, regardless of the dispositions contained in the police file, since a material part of the Monell claim may properly be (as it is here) failure to discipline or otherwise address this misconduct. Id. See, also, Ramos v. Pleaver, No. 3:96 CV92, 1999 WL 33117449, (Nov. 17, 1999 D. Conn.); Reyes v. City of New York, No. 3:00CV2300 at *2 (Oct. 16, 2000, S.D.N.Y.).

1.    **The General Order is Entirely Inadequate.**

The Defendants claim that they had a "specific Canine Policy that established guidelines and procedures relative to canine unit." General Order 41.02.17 purports to be an "adequate" policy for investigating dog bites. (Defendants' Exhibit N; "Exhibit 5", supra, page 5 of 8). A cursory examination of this "policy" either in writing or in action

demonstrates that substantial genuine issues of material facts that permeate the inadequacy of this General Order in both theory and practice.

**2.     The General Order's Investigative Provision Were Routinely Ignored by the Police Department.**

Pursuant to General Order 41.02.17, the only East Hartford police department pre-bite policy in existence pertaining to the handling of police canines, whenever a department canine bit or otherwise injured someone, was that the handler was required to provide first aid or medical attention.  "Exhibit 5", supra Facts, ¶ 52.  Additionally, post-bite photographs of the injuries were required for identification purposes and a patrol sergeant or higher-ranking officer was then required to "investigate" the incident, which includes diligently taking statements from material witnesses, and the victim, as well as statements from the officers present during the incident.

However, in practice, this investigation is not an impartial, external investigation used as a tool to ensure that canine use of force is being used properly.  Rather it appears to be a biased, ineffective and meaningless exercise that did nothing to prevent further incidents. See, e.g., Vann, supra; see also Facts, ¶¶52-59).  In fact, both Chief Shay and Sergeant Leonard, despite the obvious conflict of interest, believe that it was perfectly appropriate for the canine handler to acquire witness statements.  (Shay Tr. 32-33; Leonard Tr. 41).  The deposition testimony of Lieutenant Daniel C. Wicks, the Defendants' disclosed police expert, reveals that having the officers involved in a dog bite incident conducting witness interviews

for the purpose of satisfying the General Order is problematic because that officer has a

vested interest in the outcome  Wicks Tr. 197-198.  The purported policy is also inadequate

in the sense that it does not establish protocol or provide any insight on what to do as a canine

handler or how to do it when apprehending a suspect.  Wicks Tr. 179.  See also, Facts, ¶¶ 52-

59).

     The "investigation" of the Pablo Rosa and Jamie Rivera dog bites on the night in

question exemplifies this.  Sergeant Leonard was the investigating officer pursuant to General

Order 41.02.17.  At his deposition, he testified that:

1.     He never had any training on how to conduct investigations involving the actions of other police officers (Leonard Tr. at 28-29);

2.     He believed it was reasonable to have the arresting officer and/or the canine officer be the one to take the statements of witnesses (Leonard Tr. 41);

3.     The purpose of the General Order 41.02.17, as enacted,  was simply to document the injury, as opposed to looking into whether the conduct of the handling officer and dog was proper.  Leonard Tr. 32; "Exhibit 4", supra, at 7-10; Facts, ¶¶ 52-59.

4.     No required separate investigation or report was done on Jamie Rivera, although he was subsequently bitten by canine Bruno when found outside the 140 Silver Lane apartment building.  (Facts, ¶59).

In fact, Sergeant Leonard did not even pretend to follow the General Order. He admittedly did not review any statements of witnesses. Instead, he made his determination after he merely reviewed Officer Proulx's and Officer McGeough's initial police reports, by concluding that "[i]t's my opinion that the canine handler operated within the guidelines of the General Order." (Leonard Tr. at 42). Thus his opinion was based solely on Officer Proulx and Officer McGeough's initial police reports, and not on any victim or witness statements, as required by the General Order. Id.

Accordingly, the actual implementation of the General Order in this case reveals woeful inadequacies. There is evidence that while the General Order was not followed in the case of Pablo Rosa, it was not even implemented in the first instance in numerous other prior dog bite matters.

To further demonstrate the inadequacy of the "policy," as previously referenced, there was a second individual bite by the canine that evening, one Jamie Rivera. (Leonard Tr. 54). Sergeant Leonard, as watch commander, was responsible for completing all General Order reports for dog bites occurring under his watch. (Leonard Tr. 53). However, no General Order investigation was conducted into the bite inflicted on Jamie Rivera. No photographs of his face and injuries were taken, as required by the General Order; no witness statements; no compliance with the General Order whatsoever with regards to Jamie Rivera. Sergeant Leonard stated that a failure to follow the General Order as to Jamie Rivera's run-in with Officer Proulx and his canine would be an "oversight." (Leonard Tr. 57). In fact, consistent

with how the Jaime Rivera dog bite incident was dealt with, many of the prior General Order reports were generated in regard to conduct of Officer Proulx, were replete with omissions and inadequacies. See "Exhibit 3", supra. Additionally, based on the failure to even investigate Jamie Rivera's dog bite injures, one must naturally wonder how many other dog bite "noninvestigations," in contravention of the General Order, occurred previously.

The fact that commanding officers responsible for implementing the General Order did not view it as a means of investigating whether the conduct of the canine and handler were proper, raise additional genuine issues of material fact as to deliberate indifference on the part of the East Hartford Police Department. (Facts, ¶¶ 52-59). It is evident form Sergeant Leonard's testimony that there has been no meaningful attempt on the part of the municipality to investigate or prevent further incidents. See, e.g., Vann v. City of New York, 72 F.3d 1040, 1049 (2d Cir. 1995). Id.

The woeful inadequacy of the General Order 41.02.17 policy becomes further magnified when all of the incidents reported are examined. Through the discovery process, Mr. Rosa's counsel received 46 total incident reports, 33 of which described a dog bite incident. 32 of the 33 dog bite incidents involved the canine Bruno, with Officer Proulx as handler. Of the 33 incidents, only 3 reported a dog bite involving Officer Kornfeld and Luke, a second canine officer and canine for the East Hartford Police Department during the pertinent time period, while two reports contained incidents in which both Bruno and Luke separately bit suspects arising from the same investigation and were not reported separately

(similar to the instant case). Fifteen out of the 33 reports contained no General Order report by the supervising Sergeant (or higher ranking officer) in that either the Sergeant making the report was involved in the incident and did not file a distinct or adequate General Order review of it and/or simply no report was filed. Incredibly, the bite victim's written statement was taken in only one incident. "Exhibit 3"; supra.

Thus, it is not clear that the 33 dog bite incidents disclosed by the Town of East Hartford actually reflect all incidents involving a dog bite by an East Hartford police canine. As is evident from the failure to comply with General Order 41.02.17 in the case of Jamie Rivera, it is distinctly possible that other "oversights" may have occurred. The sheer number of reported dog bite incidents involving officer Proulx (32) in the five years prior to the present incident, demonstrates how the investigation policy is simply ineffective. Facts ¶ 43; 52-59. Defendants' own expert witness, Daniel Wicks, testified that proper monitoring of such incidents is important to keep tabs on conduct of canine officers in the field. Wicks Tr. at 246-251.

### 3.    Canine Training Policy Is No Substitute for Policies.

Finally, the Defendants mistake canine training, including, but not limited to training for and competition in the "Police Canine Olympics, for policy. While it is not disputed that the Town of East Hartford had training in place as to the "mechanics" of handling a police canine, it is uncontroverted that the Defendants established no policy in regard to how to

properly utilize a police canine in the field when suspects need to be apprehended or arrested[6] (Facts, ¶¶ 49-51). The General Order itself makes no reference to this subject matter. Id. Certainly, Officer Proulx, who was never disciplined for mishandling of a police canine, was allowed free reign over several years to unreasonably use Bruno or Dakota to "bite and hold" unarmed suspects who had been chased, or as part of an ordinary arrest. (Facts, ¶ 49). Indeed, Chief Shay, the ultimate policymaker, testified that no formal departmental policy existed with regard to when handlers could order police canines to bite and hold a suspect, and that he believed established training allowed such tactics any time a suspect was resisting. Chief Shay Tr. at 103-104. Such an established departmental policy is clearly violative of the use of force parameters delineated in Graham v. O'Connor, supra, 490 U.S. 386 (1989).

### G.    Ratification or Supervisory Liability as to Chief Shay

Plaintiff also states a valid cause of action in Count Nine under the theory of supervisory liability. There is a plethora of fourteenth amendment based cases dealing with the liability of supervisory officials. For a defendant supervisory officer to be held liable for a § 1983 violation his or her personal involvement in the constitutional violation must be shown. This can be established by the official's direct participation in the wrongful conduct. See, e.g., Johnson v. Glick, 484 F. 2d 1028, 1034 (2d Cir. 1973). However, in the case of a

---

[6] To argue, as the Defendants do, that since the canine officers are trained in the "mechanics" of caring for and generally interacting with a police canine, they are thereby excused from mishandling them when apprehending a suspect, so long as such training is adhered to, is akin to arguing that if an officer follows his training on how to clean and maintain his gun, he is then free to shoot a suspect with impunity.

supervisory official, direct participation is not always necessary: "Indeed, a supervisory official may be personally liable if he or she has 'actual or constructive notice' of unconstitutional practices and demonstrates 'gross negligence' or 'deliberate indifference' by failing to act." Al-Jundi v. Estate of Rockefeller, 885 F.2d 1060, 1066 (2d Cir. 1989) (court cited cases which held that supervisory liability attaches where an official is grossly negligent in managing subordinates who caused an unlawful event and where city's failure to train employees amounts to a gross indifference to citizen's rights.)

In Liscio v. Warren, 718 F. Supp. 1074, 1079 (D. Conn. 1989), the court stated that a supervisory official is directly liable for direct participation in the event but also: . . . a supervisory official may be liable if he (sic) learned of the violation and failed to remedy the wrong, if he (sic) created or permitted the policy or custom under which the unconstitutional practices occurred, or if he (sic) was grossly negligent in managing subordinates who caused the violation ....

The Second Circuit has held that a supervisor may be found liable for his deliberate indifference to the rights of others by his failure to act on information indicating unconstitutional acts were occurring or for his gross negligence in failing to supervise his subordinates who commit such wrongful acts, provided that the plaintiff can show an affirmative causal link between the supervisor's inaction and her injury. See, e.g., Williams v. Smith, 781 F.2d 319, 323-24 (2d Cir.1986) (concluding that a prisoner stated a section 1983 claim against the prison superintendent asserting a violation of his rights at a prison

disciplinary hearing because the evidence could show either that the superintendent was directly responsible for the conduct or that he allowed an unconstitutional policy or custom to continue despite the frequency of violations during hearings); <u>Meriwether v. Coughlin</u>, 879 F.2d 1037, 1047- 48 (2d Cir.1989) (affirming finding of supervisory liability when evidence showed that supervisors knew or should have known that plaintiff inmates' reputations as alleged planners of a violent insurrection would expose them to extreme hostility from the guards, yet took no precautions for the inmates' safety).

In the instant matter, Chief Shay, as the ultimate policy and decision maker, has ratified the department's lack of established and implemented policies in regard to use of a police canine in apprehending and/or arresting suspects.  He has also ratified the Town's failure to properly investigate prior incidents of canine mishandling, as well as related inadequate monitoring, discipline and adjustment of tactics in the field, as necessary.  <u>See</u>, <u>e.g.</u> Facts, ¶¶ 43-59.

### H.    There are Valid Causes of Action under Article First of the State Constitution.

The Defendant states that the Plaintiff's state Constitutional claims must fail as a matter of law because, according to the Defendants, "there are no such causes of action pursuant to the Connecticut Constitution."  It should be noted that the Defendants' recitation of the law is just plain mistaken.

"In our system of federalism, it is established that the State Constitution may be a source of individual liberties more expansive than those conferred by the Federal Constitution." State v. Dukes, 209 Conn. 98 (1988), quoting Pruneyard Shopping Center v. Robbins, 477 U.S. 74, 81 (1980). Thus, "[f]ederal law, whether based upon a statute or constitution, establishes a minimum national standard for the exercise of individual rights and does not inhibit state governments from affording higher levels of protection for such rights." Cologne v. Westfarms Associates, 192 Conn. 48, 57 (1984).

In Binette v. Sabo, 244 Conn. 23 (1998), for example, the Connecticut Supreme Court expressly held that causes of action brought pursuant to Article First, Sections 7 and 9 are permissible and therefore, may be brought directly under the Connecticut Constitution on a case by case basis. cf. Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971); Kelly Property Development, Inc. v. Lebanon, 226 Conn. 314 (1993).

The Connecticut Supreme Court further recognized that, in Binette v. Sabo, a claim could be brought directly under the Constitution against government agents who violated citizens' rights to be free of unreasonable searches and seizures. See also State v. Stoddard, 206 Conn. 157 (1988) (requiring police to inform a suspect of timely efforts by counsel to provide pertinent legal assistance and declaring that no section of our State Constitution should be construed as more important than another.)

Additionally, numerous commentators have supported direct Connecticut constitutional actions for damages as an effective means of private enforcement of constitutional and statutory rights. See, e.g., Satter, R. and Beballe, S., "Litigation Under the Connecticut Constitution—Development of a Sound Jurisprudence," 15 Conn. L. Rev. 76 (1982).

Furthermore, states are increasingly recognizing the viewpoint of Justice Borden, who dissented in Kelley, supra, 226 Conn. 353, which provides in pertinent part, as follows:

> [T]he point I want to stress here is that state courts cannot rest when they have afforded their citizens the full protections of the federal Constitution. State Constitutions, too, are the font of individual liberties, their protections often extending beyond those required by the Supreme Court's interpretation of federal law. The legal revolution which has brought federal law to the fore must not be allowed to inhibit the independent protective force of state law, for without it, the full realization of rights cannot be guaranteed. Brennan State Constitution and the Protection of Individual Rights, 90 Harv. L. Rev. 489, 491 (1977)

In fact, state courts typically and understandably have been even more willing than federal courts to find the existence of a "special relationship" requiring the police to undertake affirmative steps to protect individuals. In New York, for example, a court found in the language of the New York City Charter imposing upon the police the "duty" "to preserve the public peace, prevent crime,…suppress riots…disperse unlawful or dangerous assemblages…protect the rights of persons and property…and prevent the violation of all laws and ordinances" a sufficient special relationship to empower it to order the police to

37

provide protection to a Korean shopkeeper. Jang v. Brown, 560 N.Y.S. 2d 307 (N.Y. App. 1990).

In Connecticut, as well, where statutes delineating public policy obligations of police departments exist, the Supreme Court has been similarly, strongly inclined to find the existence of a "special relationship" with the member of the class to whom the statutorily defined obligation is directed.

Thus, for example, a Connecticut court found in a state statute, (Conn. Gen. Stat. 54-1f(a)) requiring officers to prevent crimes, a duty on the part of an off-duty police officer to intervene and protect a fellow patron from being assaulted. McCormack v. Romano, 17 Conn. L. Rptr. No. 1, 5 (1996); see also Kalina v. City of Waterbury, 9 CSCR 505 (Conn. Super. 1994) (finding a duty to protect a spouse from her estranged husband in the state's family violence statute, Conn. Gen. Stat. §46b-38b.)

I.  **Plaintiff's respondeat superior claim is supplanted by its Statutory Claims in Counts Fourteen and Fifteen, therefore Count Twelve is Withdrawn.**

Defendants argue that count twelve of the Complaint should be stricken because there is no reference to a statute abrogating the defendant Town's governmental immunity. However, the Complaint clearly alleges that the Town is liable under Conn. Gen. Stat. §52-577n and § 7-465. The Plaintiff recognizes that Count Twelve is redundant in light of Counts Fourteen and Fifteen. Mr. Rosa has availed himself of these statutes, and his common law claim based on respondeat superior, Count Twelve, is withdrawn accordingly. See Hughs v.

City of Hartford, 96 F. Supp. 2d 114 (D. Conn. 2000) citing Velez v. City of New London, 96

F. Supp. 2d  (claim of respondeat superior liability on part of municipality is redundant, in

that plaintiff can pursue indemnification under § 52-557n and § 7-465).

### J.  Whether the Defendants' use of force was justified under Connecticut Law is in dispute.

Defendants contend that Mr. Rosa's state law claims (counts 3-8) are subject to

dismissal because Conn. Gen. Stat. §53a-22 provides that an officer is justified in using

physical force when he or she believes it is reasonably necessary to effect an arrest or prevent

an escape from custody of a person whom the officer reasonably believes committed an

offense, or to defend him or herself from imminent use of physical force by a third party.

For reasons already briefed herein in detail, it remains in dispute whether officer

Proulx's actions were reasonable. See Facts, supra.

### K.  Whether the Plaintiff was committing a Tort or Trespass is a Material Issue of Fact Precluding Summary Judgment under the Connecticut Dog Bite Statute, C.G.S. § 22-357.

Defendants claim that Conn. Gen. Stat. §22-357 does not apply because Mr. Rosa

committed a tort at the time of the dog bite in that he "was fleeing from the police and

resisting the defendant officer's verbal instructions to stop resisting arrest." Def. Memo at 30.

First, contrary to Defendants' Local Rule 9(c)1 (sic.) statement, it remains disputed that Mr.

Rosa was fleeing from police, or that there were ever any verbal instructions given to Mr.

Rosa to "stop resisting arrest."  (Facts, ¶'s 19; 24-31).

Indeed, for example, there is a genuine issue as to whether Mr. Rosa was merely turning from an unaccompanied dog charging in his direction. (Facts, ¶ 24-25). There is also, for example, a genuine issue as to whether the defendant officers actually held the fire door closed to allow the unaccompanied police canine to continue attacking the unarmed and unresisting Mr. Rosa. (Facts ¶'s 24-31).

Thus, summary judgment must be denied.

### III.    **CONCLUSION**

#### A.    **Excessive Force**

Although the facts for the purposes of a Motion for Summary Judgment must be viewed in the light most favorable to the nonmoving party, the Defendants seemingly take the untenable position that the Court should consider a version of the facts most favorable to them. The problem with this approach, in addition to the obvious problem that it is erroneous, is twofold.

First, there exist genuine issues of material fact here, as proffered by the myriad witnesses, large enough to "drive a truck through". Second, even if the facts are presented in the light least favorable to the Plaintiff (sic), as suggested, issues of fact still remain as to whether it was reasonable to release canine Bruno on the Plaintiff.

#### B.    **Monell Count**

Additionally, genuine issues of material fact exist as to whether the conduct of the Town of East Hartford, as ratified by Chief Shay, exhibited "deliberate indifference" in that it

failed to (1) establish acceptable protocol for use of police canines in apprehending suspects; and (2) inadequately investigated, reviewed, monitored and/or disciplined repeated mishandling, over time, by a canine officer.

**WHEREFORE**, the Plaintiff respectfully requests that the Court deny the Defendant Town of East Hartford's Motion for Summary Judgment in its entirety.

Respectfully submitted,

**THE PLAINTIFF,**
**PABLO ROSA**

BY: _David K. Jaffe_
David K. Jaffe, Esq.
Eisenberg, Anderson, Michalik & Lynch, LLP
136 West Main Street
P.O. Box 2950
New Britain, CT 06050-2950
Tel: (860) 229-4855
Fax: (860) 223-4026

41

## CERTIFICATION

This is to certify that a copy of the foregoing has been mailed to all counsel of record this 12th day of November, 2003.

**Thomas R. Gerarde, Esq.**
**Howd & Ludorf**
65 Wethersfield Avenue
Hartford, CT 06114-1190


**A. Paul Spinella, Esq.**
**Spinella & Associates**
Law Offices of Spinella & Associates
One Lewis Street
Hartford, CT 06103

David K. Jaffe, Esq.
Commissioner of the Superior Court