

Exhibit A

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

*******************************************
| | |
|---|---|
| PABLO ROSA, | *    CIVIL ACTION NO: |
|     Plaintiff. | *    3:00CV1367 (RNC) |
| | * |
| VS. | * |
| | * |
| TOWN OF EAST HARTFORD; | * |
| OFFICER WILLIAM PROULX; | * |
| OFFICER FRANCIS J. MCGEOUGH; | * |
| SGT. JAMES E. LEONARD; | * |
| OFFICER THOMAS CASTAGNA; | * |
| OFFICER JOHN DOE #1; | * |
| OFFICER JOHN DOE #2; AND | * |
| CHIEF JAMES W. SHAY. | * |
|     Defendants. | *    SEPTEMBER 30, 2002 |

*******************************************

## PLAINTIFF'S RULE 26 DISCLOSURE OF EXPERT WITNESS(ES)

Pursuant to Rule 26(a)(2) of the Federal Rules of Civil Procedure, the Plaintiff hereby discloses the following individual(s) as expert witness(es) who may be used at trial to present evidence under Rules 702, 703 or 705 of the Federal Rules of Evidence:

    1.    **Reginald F. Allard, Jr., M.S. Criminology/Police Consultant**

Appended hereto is a written report prepared and signed by Reginald F. Allard containing (a) a complete statement of all opinions to be expressed, within a reasonable degree of forensic certainty, and the basis and reasons therefore; (b) the data or information considered by Mr. Allard in forming his expert opinion; (c) any exhibits to be used as a summary of or support for the opinion; (d) his qualifications, including a list of publications authored by Mr. Allard within the past ten (10) years; (e) the compensation to be paid for the study and testimony; and, (f) a listing of any other cases in which Mr. Allard has testified at trial or by deposition within the preceding four (4) years.

Mr. Allard is also expected to rely on additional pertinent discovery materials and exhibits as they are produced in this case in formulating his opinion for trial. Additionally, he may utilize demonstrative evidence as well.

2.  **Michael L. Reed, M.D., FACS**

Appended hereto is a written report, prepared and signed by Michael L. Reed, M.D. containing (a) a complete statement of all opinions to be expressed, within a reasonable degree of medical certainty, and the basis and reasons therefore; (b) the data or information considered by Dr. Reed in forming his expert opinion; (c) any exhibits to be used as a summary of or support for the opinion; (d) his qualifications, including a list of publications authored by Dr. Reed within the past ten (10) years; (e) the compensation to be paid for the study and testimony; and, (f) a listing of any other cases in which Dr. Reed has testified at trial or by deposition within the preceding four (4) years.[1]

Dr. Reed is expected to rely on additional pertinent discovery materials and exhibits as they are produced in this case in formulating his opinion for trial. Additionally, he may utilize demonstrative evidence as well.

Dated at New Britain, Connecticut, this 30th day of September 2002.

                      **PLAINTIFF, PABLO ROSA,**

BY: _/s/ David K. Jaffe_
David K. Jaffe, Esq.
Eisenberg, Anderson,
Michalik & Lynch LLP
136 West Main Street
P.O. Box 2950
Fed Bar ct#04640
New Britain, CT 06050-2950
Telephone: (860) 229-4855

---

[1] Dr. Reed has not testified in a case in the past four (4) years.

## **CERTIFICATION**

This is to certify that a copy of the foregoing was mailed, postage prepaid, this 30th day of September, 2002, to:

Thomas R. Gerarde, Esq.
Howd & Ludorf
65 Wethersfield Avenue
Hartford, CT 06114

_____
David K. Jaffe



Reginald F Allard Jr.

Police Consultant
350 Rockwood Drive
Southington, Connecticut 06489
Tel # (860) 621-1013 Fax # (860) 621-1013
E-Mail: regallard@aol.com
Web page: http://www.expertcop.com

Attorney David K. Jaffe
Eisenberg, Anderson, Michalik & Lynch LLP
136 West Main Street
PO Box 2950
New Britain, Connecticut 06050-250
Tel: 860.229.4855
Fax: 860.223.4026
Website: http://www.eaml.com

**Re: Rosa v City of East Hartford**

For purposes of identification, my full name is Reginald F. Allard, Jr.. I am currently employed by the State of Connecticut as a Training Officer for the Police Officer Standards & Training Council (P.O.S.T.C.) located at the Connecticut Police Academy, having held this position for the past 18 years. Previous to this sworn peace officer position, I was a police officer with the New Britain, Connecticut Police Department for 11 years, having attained the ranks of Detective and Sergeant. While being employed by the Connecticut Police Academy, I was granted a leave of absence and became a police lieutenant for the Woodbridge, Connecticut Police Department in 1989. My tenure as a sworn police officer has spanned 29 years. During this time, I have trained in excess of 11,000 police officers, acquired a Masters degree in Criminal Justice, and have experienced the broad breadth of practical police experience as a police officer, police supervisor, and police trainer. My primary duties at the Connecticut Police Academy encompass 23 training topics inclusive of Laws of Arrest, Firearms, Baton, OC spray, Police Discretion/Decision-Making, Patrol Procedures, Officer Safety, Use of Force, Prisoner Restraint and Transport protocols. I have been retained, on 67 instances, as a consultant or as an expert witness for state and federal police procedures litigation as to the appropriate standard of care police officers used or failed to use during police-citizen encounters in Connecticut, Massachusetts, Rhode Island, Vermont, New York, New Jersey, Pennsylvania, Texas, Ohio, Missouri, Kentucky, and California.

Attached are my current CV, expert witness case history and fee structure.

*Bibliography and Case Material Reviewed:*

**INCIDENT : November 26, 1998 7:03p.m.**
*140 Silver lane, third floor*
*Dispute call – no weapons/possible weapon… four Hispanic males and no weapons*

1. Graham v. Connor, 490 U.S. 386, 394, 104 L. Ed. 2d 443, 109 S. Ct. 1865 (1989). ... "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." ... we pay "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."
2. Canton v. Harris, 489 U.S. 378, 103 L. Ed. 2d 412, 109 S. Ct.1197 (1989)
3. Flamer v Yonkers 309 N.Y. 114 (1955)
4. Pride v. Does, 997 F.2d 712 (10th Cir. 06/15/1993)…the relevant question for the court is not whether Pride acted in a threatening manner but whether Officer Lamb reasonably believed so.
5. Police Use of Non-deadly Force to Arrest John Hall FBI Law Enforcement Bulletin October 1997 Police Officers are taught to avoid a self-imposed zone of danger by taking all tactical precautions necessary to reduce the probability of a pre-mature engagement contrary to good discretionary police procedure. Police officers are not trained to exercise force restraint judgment, bordering upon superhuman infallibility, with foresight benefited by hindsight. Rather, police officers have a duty to protect others and themselves from foreseeable consequences of their actions. Police officers are trained to exercise their duty to act with reasonable care and diligence under the circumstances using tactical care commensurate with the danger confronted. The risk *reasonably to be perceived* defines the duty to be obeyed tactically by the at-scene officers.
6. IACP training Key # 249 Taking Prisoners into Custody
7. IACP Model Policy: Use of Force  - Effective Date: August 2001 Reevaluation Date: August 2002
8. IACP Model Policy Law Enforcement Canines originally Published: August 1991 Revised: July 2000
9. Connecticut State Police Canine Policy
10. IACP Model Policy Use of Force January 31, 1990
11. IACP National Law Enforcement Policy Center Reporting Use of Force Concepts and Issues Paper August 2000
12. Johnson v. Glick, 481 F.2d 1028, at 1033 (2d Cir.1973), cert. denied, 414 U.S. 1033 (1973).
13. Chew v. Gates, 27 F.3d 1432, 1440 (1994).
14. <u>Saucier v. Katz, No. 99-1977 (U.S. 06/18/2001)</u>
15. Constitutional Constraints on the Use of Force by John Hall: FBI Law Enforcement Bulletin February 1992
16. Police Use of Non-deadly Force to Arrest John Hall FBI Law Enforcement Bulletin October 1997
17. Conn. Gen. Statute 53a-22. Use of physical force to effect an arrest or prevent escape.
18. Monell v. New York City Dep't of Social Services, 436 U.S. 658, 56 L. Ed. 2d 611, 98 S. Ct. 2018 (1978)
19. East Hartford Police Incident report 98-40435…140 Silver Lane, Apt C-17..11/26/98 1903 hrs.
    - Jewell, Hardy and Allen stated they observed Fernando Rivera with a firearm…Complainant went on to state she saw Fernando pass off the firearm to one of the other parties. Alisha Nance, Kenneth Hardy, and Antwan Allen…all three parties stated they observed a firearm in Fernando Rivera's possession.

20. East Hartford Police Report – Officer Proulx 11/26/98
    - ...one party may be armed...man with a gun...fearing for my safety, I drew my pistol and yelled "police don't move"....Everyone complied except Pablo Rosa and Jamie Rivera...Rosa's right hand was concealed in his clothing near his waist...a female screamed he has a gun and pointed at the fleeing Rosa and Rivera...I warned them to stop or I would release a trained police dog...I commanded K-9 Bruno to engage the suspects...fearing that the first police officer through the door would be shot, I commanded Bruno to go through the partially open door and engage the suspect (Rosa).
21. East Hartford Police Report – Sergeant James E. Leonard – 11/28/98
    - A sworn statement was taken from Alisha Nance of 140 Silver Lane, C-17....It is my opinion that the K-9 handler operated within the guidelines of the General Order ( 41.02.17 ) Patrol Canine.
22. Felicia Oliver Statement
23. Alicia Nance Statement
24. Deposition of Francis McGeough August 9, 2002
25. Deposition of James W. Shay August 9, 2002
26. Deposition of William Proulx March 21, 2002
27. State of Connecticut Trial Transcript April 14, 2000
    - Charges: Breach of Peace, Interfering with a Peace Officer and cruelty to animals(not claimed - nolle)
    - Officer Francis McGeough – December 1995 ...19:03 hrs 140 Silver lane...possibly a weapon involved...a female...I think they have a gun...a lot of people yelling...two males broke from the group and ran...a woman is saying, he got a gun...and pointing towards the two males...dog was not on leash...keep them from running...trying to conceal something...the dog pulled the defendant off the door...and the defendant went to the ground and complied with our lawful orders...duration of the bite seemed to be about 5 seconds...defendant did not make any noise...I did not observe any physical injuries...I brought him back through the fire door...a gun was not located...COURT...at first I thought I heard that there was a weapon, and then later there possibly was a weapon... pg23 ...complainant in C-17 called the police and said there were four Puerto Ricans who were fighting in the hallway of the third floor...no weapons involved, I think they've got guns(anonymous)..At first I was told it was not an active...that there's no weapons involved and then the second dispatch...possibly have weapons...page 25...perhaps there was a gun involved...woman holding the coded door....I think they have a gun...Pg 25...then the complainant standing out of her apartment with the two guys fleeing saying they had guns...Pg 26..At least you believed there to be a firearm involved...Yes... pg 26...dispatcher Learned... pg 28...dispatcher Learned was the dispatcher in the Aselton matter...pg 29...a gun possibly involved...pg 31...dispatcher.. a lot of commotion going on...dispute...two separate 911 calls... pg 33...dispatcher four Hispanic males and no weapons...page 35..I had my weapon out of its holster...pg 35...Nan—she was pointing to two guys who were running saying, they have a gun pg 37...Elisha Nance C-17
    - ...violent commotion...pg 41...observed 3 to 5 seconds...I did observe the first bite...pg 52 ..5 to 10 seconds...pg 54...Oliver was a witness and Nance was the complainant..

- Officer William J. Proulx: pg 68...Connecticut State Police Training...6 years...5 canine handlers..14 week program...graduated first in my class...mandatory monthly training page 69...Canine Bruno...Nov 26, 1998...fight...disturbance...possibility of a firearm and a weapon...pg 71..lady holding the door...fight...somebody had a gun...canine was off leash...pg 72...had my pistol in my hand...page 73...two people in the group ran away from me...pg 74...I called out stop, or I'd release the trained police dog...woman to my left yelling and pointing, they have a gun...locate the suspect, and bite, and hold the suspect until I tell him to release...pg75...5 to 10 seconds...barking at times on the third floor...pg 80..80 pound German Shepard...Jamie Rivera received a dog bite pg 81..we did not find a weapon ...pg 8...page 96...a lady yelling and pointing, they have a gun. They have a gun...I don't recall anyone running into C-10...gun re-holstered when I got to the door...page 98..who was watching the suspects...nobody... page 98...knew the type of injury that was capable of being sustained page 100....apartment C-10 looking for a gun?? Page 101(angel Rivera)

28. One Colored photograph of Pablo Rosa's Left Leg
29. Hartford Courant Articles:
    - Bruno was known for his bark but mostly his bite. He chomped on the legs and buttocks of dozens of suspects over the years...
    - Courant Article July 31, 2000....With more than 1,000 arrest and 30 bloody bites
    - Courant article...November 24, 1999 Clayvern Fothergill lawsuit
    - Courant Article April 14, 1999...Regina Olen-Smith Lawsuit
    - Courant Article May 27, 1999...Dog-bite lawsuits..Clayvern K. Fothergill Sr.;Kenneth Floyd;Jamie Rivera; Pablo Rosa.
    - Hartford Courant article dated January 21, 1998 Robert E. George Jr. Dog-bite Lawsuit
    - Hartford Courant article May 2, 1998...Anthony Brocuglio acquitted
    - Hartford Courant article Otis Charles Knight Lawsuit...
    - Hartford Courant article January 24, 1995 Leroy James dog bite incident...reviewed by Chief James W. Shay
    - Hartford Courant article Law suit Stephen Roye
30. Summons- Civil August 3, 2000
31. Deposition of Pablo Rosa – March 21, 2002
32. Officer Proulx training Record:
    - Dates for K-9 Training 4/13/2000;5/19/2000;5/31/2000
    - N.E. K-9 Academy – 32 hrs
    - Hampden City Sheriff – 8 hrs
    - Connecticut State Police Training14 week program...graduated first in my class...mandatory monthly training

*Discussion:*

The appropriateness of the force used to accomplish Mr. Rosa's seizure must be assessed in the context of the "reasonableness" standard. The objective nature of the standard was clearly set forth in Graham, where the U.S. Supreme Court emphatically rejected the consideration of such subjective factors as the officer's state of mind in assessing the propriety of a use of force. The Court emphasized that the inquiry is "whether the officers' actions are `objectively reasonable' in light of the facts and circumstance confronting them, without regard to their underlying intent or motivation." An officer's state of mind is relevant, however, when the circumstances, viewed objectively, do not justify action (Scott v. United States, 436 U.S. 128, 138, 98 S. Ct. 1717, 56 L. Ed. 2d 168 (1978). An excessive force inquiry includes not only the officers' actions at the moment that the threat was presented, but also includes their actions in the moments leading up to the suspect's threat of force."[t]he reasonableness of Defendant(officers) actions depends both on whether the officers were in danger at the precise moment that they used force and on whether the officer's own reckless or deliberate conduct during the seizure unreasonably created the need to use such force."...

...thus we consider an officer's conduct prior to the suspect's threat of force if the conduct is "immediately connected" to the suspect's threat of force(Bella v. Chamberlain, 24 F.3d 1251, 1256 n.7 (10th Cir. 1994), cert. denied, 115 S.Ct. 898 (1995); see also Tennessee v. Garner, 471 U.S. 1, 8-9 (1985) (objective reasonableness inquiry requires courts to examine "whether the totality of the circumstances justified a particular sort of search or seizure")). An officer's conduct prior to the suspect's threat of force is relevant if the conduct is "immediately connected" to the suspect's threat of force (Romero v. Board of County Comm'rs, 60 F.3d 702, 705 n.5 (10th Cir. 1995), cert. denied, 116 S. Ct. 776 (1996); Romero, 60 F.3d at 705 n.5). In a footnote in Graham, "in assessing the credibility of an officer's account of the circumstances that prompted the use of force, a fact finder may consider, along with other factors, evidence that the officer may have harbored ill-will toward the citizen." 490 U.S. at 399 n.12 ...when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." Smith v. Wade, 461 U.S. 30, 56 (1983); see also Jeffries v. Harleston, 21 F.3d 1238, 1249 (2d Cir.), vacated on other grounds, 115 S. Ct. 502 (1994).

The assessment of *"Objective Reasonableness"* does not concern itself with possibilities, but only with reasonable probabilities and their corresponding rational inferences. Sufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment. The test is objective, meaning that it is based on what a reasonable, well trained police officer would believe, **not** what the particular/arresting officer actually did believe. Justification for the use of force must be limited to what reasonably appeared to be the facts known to the officer at the **moment** the chosen force option was implemented. Police training articulates that the amount of police force necessary and reasonable to effect an arrest is judged by an ordinary, prudent person given the officer's training and experience.

A police officer is never entitled to use more physical force than is reasonably necessary to effect an arrest or to defend himself or another. To measure the objective reasonableness of an officer's action, one must stand in Officer Proulx's shoes given his training and experience to judge the reasonableness of his actions based upon the information possessed and the judgment exercised in responding to any perceived resistance by Mr. Rosa. To evaluate his use of force under the fourth amendment standard, police training by way of the Supreme Court has instructed that the following specific factors be considered:

1) The severity of the crime at issue;
2) Whether the suspect poses an immediate threat to the safety of the officers or others, and
3) Whether the suspect is actively resisting arrest or attempting to evade arrest by flight.

Police training explains that there are three general circumstances in which officers must make judgments regarding the use of force in the context of fourth amendment seizures, that is:

1) To defend themselves and others,
2) To overcome resistance or enforce compliance, and
3) To prevent escape.

The "reasonableness" of a particular seizure depends not only on *when* it is made, but also on *how* it is carried out. ***The right of self-defense does not extend to the infliction of more harm than is necessary for the purpose of defense.*** The amount of force that is constitutionally permissible is judged within the context confronting the Officer Proulx. The fact that a person whom a police officer attempts to arrest resists, threatens, or assaults the officer no doubt justifies the officer's use of some degree of force, but ***it does not give the officer license to use force without limit.*** The force used officer Proulx ( i.e. Canine Bruno) must be reasonably related to the nature of the resistance and the force used, threatened, or reasonably perceived to be threatened, against the officer. It is clear, therefore, that there is no inherent conflict between a conviction for resisting arrest or harassment of a police officer and a finding that the police officers used excessive force in effectuating the arrest.

A police restraint method must be only that amount which is "necessary" to achieve the purposes of law ( i.e. CGS 53a-22). The industry standard for judging the appropriate use of restraint force involves a three-pronged inquiry into the subject's ( Mr. Rosa) ability to harm, his opportunity to harm, and intent to harm which places the officer or third person in jeopardy at the time the officer used force ( Canine bite seizure) against the subject.

The Supreme Court has written that "[O]ur Fourth Amendment jurisprudence has long recognized that the right to make an arrest ...necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." However, police officer may not use unnecessary force to effectuate an arrest Flamer v Yonkers 309 N.Y. 114 (1955). Additionally, a permissible investigative stop may become an unlawful arrest if the means of detention are "more intrusive than necessary." *United States v. Perea*, 986 F.2d 633, 644 (2d Cir. 1993); *Glover*, 957 F.2d at 1011; *Posr v. Doherty*, 944 F.2d 91, 98 (2d Cir. 1991). An officer's actions may be reckless, and have precipitated the need to use force ( <u>Sevier v. City of Lawrence, Kan., 60 F.3d 695, 699 (10th Cir. 1995)</u>. As a general rule, in overcoming resistance, it is necessary to tailor the use of force to the degree of resistance encountered, or in other words, to escalate the level of force as the suspect's actions dictate. Active resistance occurs when the suspect is using or threatening the use of some force to thwart the officer's efforts. A person is actively resisting a police officer when he engages in physical acts and movements that <u>constantly</u> place the officer at risk. Any force used must be a direct, measured, and proportionate response to the threat presented. The type and level of force must be tailored to its necessity. Once a particular level of force is no longer required, it must be discontinued, despite the fact that an officer's normal passions of anger, fear, or frustration may be aroused through a suspect's efforts to thwart or evade a seizure.

Police training in Connecticut and throughout the United States explains that the formula for assessing use of force considers the following criteria:

[1] the need for the application of force,
[2] the relationship between the need and the amount of force that was used,
[3] the *extent of injury inflicted*; and
[4] whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm."

The above factors are the means used to assist in the determination of "the amount of force that is necessary in a particular situation."( Graham, 490 U.S. at 396-97. The character of the offense is often an important consideration in determining whether the use of force was justified. (Chew, 27 F.3d at 1442 & n.9; Headwaters Forest, 211 F.3d at 1138-1139; Washington v. Lambert , 98 F.3d 1181, 1186 (9th Cir. 1996)).

All Connecticut officers are trained to comport themselves with restraint as they isolate, contain and subsequently, *reasonably apprehend* a suspect such as Mr. Rosa with means that are direct, measured, and proportionate, given the exercise of prudent discretion and further compelled by C.G.S 53a-22 necessity and reasonableness.

In summation, law enforcement officers are trained to exercise due care, commensurate with the perceived foreseeable risk. Police training articulates that the amount of police force necessary and reasonable to effect an arrest is judged by an ordinary, prudent *person* given *the officer's training and experience*. A police officer is never entitled to use more physical force than is reasonably necessary to effect an arrest or to defend himself or another.

**Summary of Opinions reached:**

Using my 29 years of police experience and police training, relevant law, case law review, case material reviewed, knowledge of human nature, knowledge of the motives which influence and control police practices, I have tested the facts in this instant case according to such knowledge and render the below opinions. It is understood that these opinions are "living opinions", based upon the facts and circumstances derived and disclosed to date. These opinions were formed by drawing reasonable inferences from the facts and circumstances reviewed in the light of my practical police experience and training. Additionally, my deductions and conclusions reached are from reason and common sense. My technical and specialized knowledge, skill, experience, training, and education, along with my police background assisted me in formulating my opinions. Having considered all the reviewed facts and circumstances preceding and surrounding this incident, I have formed the following opinions to a reasonable degree of professional certainty.

Under the "deliberate indifference" rule, the identified deficiency in a city's training program must be closely related to the ultimate injury. The agency did not retrain nor express that canine Bruno's conduct was improper, or unlawful. It is my **_opinion_** to a reasonable degree of professional certainty that the East Hartford police command staff authorized and/or ratify Officer Proulx's use of canine misconduct through its customs, policies, or practices. Although a flawed execution of that agency policy (General order 41.02.17 Patrol Canine) in this case, supervisors and policy decision makers (Chief Shay) agreed that this arrest and use of force protocol was in conformance with policy and training. At scene supervisors gave tacit approval and the City of East Hartford Police agency condoned this practice as custom or practice. As such, the defendant officers were motivated by their agency's training and policy.

Officers of reasonable competence could _not_ disagree, the defendant officers' actions were in total contradiction to tactical protocols under the known set of facts and circumstances. A reasonable police official should have known that the challenged custody conduct violated generally accepted police tactical arrest procedures and practices of releasing an 80 pound German Shepard canine to "bite and hold" a suspect based upon "articulable suspicion". It is my **_opinion_** to a reasonable degree of professional certainty that the officer Proulx, in this case, allowed his adrenaline to interfere with a reasoned restraint protocol during the custody seizure of Mr. Rosa.

It is my **_opinion_** to a reasonable degree of professional certainty that although an officer's actions may be found reasonable even where "officers of reasonable competence could disagree" such is not the case under the articulated facts and circumstances of Mr. Rosa's arrest. The reasonableness of the force used to effect Mr. Rosa's seizure was not balanced with the nature and quality of the intrusion (dog bite force) on the Mr. Rosa's Fourth Amendment interests (Graham, 490 U.S. at 396 and Tennessee v. Garner, 471 U.S. 1, 8 (1985)). The force used in this case was not applied against the need for that force( Liston v. County of Riverside, 120 F.3d 965, 976 (1997); Alexander v. City and County of San Francisco, 29 F.3d 1355, 1367 (9th Cir. 1994)). Mr. Rosa's arrest force inflicted was obviously enough to cause serious physical injury to Mr. Rosa. (Headwaters Forest Def. v. County of Humbolt, 211 F.3d 1121, 1133 (9th Cir. 2000).

It is my **_opinion_** to a reasonable degree of professional certainty, that the City of East Hartford did not develop, and require all officers to complete, a written report each time: canine force is used against an individual. These reports should include, at minimum, the following information: officer name; description of incident; each specific type of force used; the effectiveness of each type of force used; photographs of physical injuries sustained; description of any injuries to either a civilian or officer, and medical/hospital data; name, race and gender of the person against whom force was used; names and contact information for all witnesses; whether the individual against whom force was used was arrested or cited, and if so, the charges; date, time, and location of the incident; and the signatures of the officer and his immediate supervisor. Any supervisor who believes there is a possible violation shall make the referral to the IA Officer. Supervisors are held accountable and evaluated for their referral decisions.

Referral shall be automatic and shall take place immediately at the time of the incident for all incidents resulting in serious injury either to a civilian or to an officer. Sergeant Leonard of the East Hartford Police Department stated that Officer Proulx's use of canine force was in compliance with orders stated in agency policy.

Good judgment and the circumstances of each situation dictate the level on the continuum of force at which an officer will start. A police canine used to apprehend is best understood as an *instrumentality of force*, like a baton, to be judged according to the rules that apply to police use of force generally. Substantial force inflicting serious injury may be reasonable and necessary according to the circumstances confronting officers. As applied to police canine, the reasonable necessity standard means a dog bite is justifiable and lawful force *if and only* if the threat to officers or the public is serious - *the need for force must be sufficient to justify the injury of a dog bite.* A dog bite is not different from a laceration inflicted by a lawful baton stroke. As such, K-9 training places the use of Police Service Dogs under the legal guidance of the Supreme Court decision in Graham v Connor and Tennessee v Garner. It is my **opinion** to a reasonable degree of professional certainty that Officer Proulx unleashed Canine Bruno when faced with a minor misdemeanor offense, if one believes the facts articulated by Officers Proulx and McGeough.

Officer Proulx stated he was trained to place the canine bite and hold just prior to the impact weapon. As to the placement of canine force, Calibre Press "Street Survival" seminars suggest canines be placed in a force continuum as follows:

- Firearms
- **K-9 (Bite)**
- Baton (Striking)
- **K-9 (Bark/Hold)**
- Lateral Vascular Neck Restraint
- Active Counter Measures
- Electronic Devices
- Decentralization (Takedown)
- O.C.
- Baton (Leverage)
- Pressure Point Control/Physical Restraint/Compliance
- Verbal Commands

Given a "bite and hold" policy, the handler ( Officer Proulx ) must have complete control over the actions of the dog. With such control the handler can recall and restrain the dog before a bite occurs. Alternately, the handler can quickly remove the dog from the apprehended suspect. A dog handler must have complete control over the actions of his dog. Handler control dictates to the dog what type of response is appropriate for the situation. The handler makes the decision to escalate or de-escalate the dog's level of response, not the dog.

The IACP (International Association of Chiefs of Police) Model Policy represents that Decisions to deploy a canine shall be based upon the Graham v Connors factors following:

    a.    the severity of the crime;
    b.    whether the suspect poses an immediate threat to the safety of the officers or others; and
    c.    whether the suspect is actively resisting arrest or attempting to evade arrest at the time.

Further, that it is the duty of the canine supervisor to ensure that basic and in-service training and certification is conducted on a regular basis. Further that the use of specially trained police canines for law enforcement responsibilities constitutes a real or implied use of force. In this, as in other case, officers may only use that degree of force that reasonably appears necessary to apprehend or secure a suspect as governed by the department's use-of-force policy. In addition, whenever a canine has bitten

or scratched an individual has alleged to have done so, whether or not in the line of duty, the handler shall: Except in exigent circumstances or where there is an imminent danger of death or serious injury, the canine should be kept in visual contact by the canine handler. The IACP model policy also directs that:

- When apprehending suspects, the canine shall be commanded to disengage as soon as the suspect is subdued or readily complies with officer direction.

- Canine officers may use canines to apprehend fleeing suspects when it *is objectively reasonable* to believe that
    a. the suspect has committed a felony, or a serious or high-grade misdemeanor and
    b. the suspect is actively resisting arrest or attempting to evade arrest by flight.

*The IACP policy defines Objectively Reasonableness as:* This term means that, in determining the necessity for force and the appropriate level of force, officers shall evaluate each situation in light of the known circumstances, including, but not limited to, the seriousness of the crime, the level of threat or resistance presented by the subject, and the level to the community.

The Connecticut State Police Canine Policy conforms its agency policy to <u>CALEA 1.2.6</u> and CALEA 1.3. standards when it stipulates that "Only the minimum amount of force necessary to achieve a lawfully inten result should be used when deploying a department canine under the direction of its handler. Handlers sh rely on state statutes and department directives and training to determine when it is necessary to resort to use of force through a canine to accomplish lawful objectives. Handlers shall also consider the following to determine whether the use of force through a canine is appropriate:
1) Severity of the crime;
2) Whether the suspect poses an immediate threat to the safety of the handler or other persons;
3) Whether the suspect is actively resisting arrest or attempting to evade arrest by flight.

It is my **opinion** to a reasonable degree of professional certainty that Officer Proulx utilized canine Bruno to seize Mr. Rosa unreasonably by releasing a dangerous animal trained to "bite and hold " for minor offenses and in this case, based upon alleged articulable suspicion of weapon possession. Plaintiff Rosa was seized and sustained severe lacerations to his leg. By all accounts, the force used to arrest Mr. Rosa was severe. Mr. Rosa was hospitalized for 5 days due the multiple dog bites one of which is alleged to have occurred in the hallway at 140 Silver Lane. Mr. Rosa was apprehended by a dog taught to seize suspects by biting hard and holding. Officer Proulx acknowledged that the injuries to Mr. Rosa were "pretty severe," and that "there were some serious lacerations." The fourth amendment permits use of deadly force to apprehend a fleeing felon where there is "probable cause to believe the suspect poses a threat of serious physical harm". Mr. Rosa posed no immediate safety threat to anyone. The existence of a factual question as to whether Mr. Rosa posed a safety threat awaits a finding of credibility of the defendant officer's account of the facts confronting them. With respect to whether Mr. Rosa was "actively resisting arrest," it is disputed that he ran from the police. He did not, however, resist arrest to the point of offering any physical resistance to the arresting officers, nor, at the time the officers released the dogs, did they have any particular reason to believe that he would do so. With respect to whether he was attempting to evade arrest by flight when canine Bruno was released, the answer is yes and no. In a general sense he was, but in more precise terms his flight had terminated, at least temporarily behind the metal hallway door, if one is to believe the officer's version.

*Reginald F. Allard, Jr. – Expert Opinion Report - September 30, 2002*                              9

Turning to the severity of the crime, under all of the circumstances, the question of the reasonableness of the decision to use canine force involved, whether or not "deadly," to seize Rosa must be submitted to a jury. The most important factor - the absence of an immediate safety threat - cuts strongly in Mr. Rosa's favor, while the other two force criteria (flight and resistance) tilt only slightly in favor of the defendants. Such a record does not render reasonable as a matter of law the considered judgment to unleash a dog trained to seize suspects by "biting hard and holding," by mauling and sometimes seriously injuring them.

Mr. Rosa asserts that he did not offer resistance at any time and his injuries resulted from the city's policy regarding the use of canine force. There was a history of dog-bite injuries known to the police chief and city. The canine procedures adopted by the city left Officer Proulx with unfettered discretion as to the means of apprehending the suspects. Such canine seizure conduct violated clearly established constitutional and statutory requirements of which a reasonable person would have known. It is my **opinion** to a reasonable degree of professional certainty that the use of Bruno for the purpose of apprehending Mr. Rosa was an objectively unreasonable act. In releasing the dog, the city's policy of training police dogs such as Bruno to apprehend unarmed and non-resistant suspects by biting, mauling, and seizing them was itself unreasonable and unconstitutional. Given the general policy of "bite and hold". The use of canine "Bruno" was the use of unreasonable force to effect the arrest of Mr. Rosa.

It is my **opinion** to a reasonable degree of professional certainty that Mr. Rosa's injury was caused by city policy and abuse of officer discretion. A city cannot escape liability for the consequences of established and ongoing departmental policy regarding the use of force simply by permitting such basic policy decisions to be made by lower level officials who are not ordinarily considered policymakers. The city of East Hartford had a "custom or usage" regarding the use of police dogs for which the city is responsible. (City of St. Louis v. Praprotnik, 485 U.S. 112, 127, 99 L. Ed. 2d 107, 108 S. Ct. 915 (1988). It is a known that a high ratio of bites to apprehensions may strongly indicate a misbehaving dog or a misbehaving handler. On an average, less than 30% of apprehensions should result in a bite. Thus, canine units with an average bite ratio of 20% or higher should be *reviewed* by the policy makers to modify and adjust canine policy. A written policy should exist in all canine units, specifying departmental policies regulating the control of canine units, consistent with case law, for canine usage and deployment in felony and misdemeanor actions. Police Dogs must be subject to continual, rigorous training in law enforcement techniques. Such training ensures that the dogs will continue to respond with alacrity to the commands of their handlers; without such training, the dogs' responsiveness to their handlers' commands will deteriorate, resulting in more frequent and more serious injuries to apprehended suspects than might otherwise occur. Where the city equips its police officers with potentially dangerous animals, and evidence is adduced that those animals inflict injury in a significant percentage of the cases in which they are used, a failure to adopt a departmental policy governing their use, or to implement rules or regulations regarding the constitutional limits of that use, evidences a "deliberate indifference" to constitutional rights. It is my **opinion** that is was sufficiently clear that the unlawfulness of Officer Proulx's action would have been apparent to a reasonable officer. The city of East Hartford had a policy of permitting the use of police dogs to prevent the escape of all suspected criminal suspects, regardless whether the officer "has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." Deadly force is force that creates a substantial risk of causing death or serious bodily harm. Whether a particular instrument of force qualifies as an instrument of deadly force is a question of fact. Indeed, whether particular dogs as trained and deployed, qualify as deadly weapons has been uniformly treated as a question of fact for the jury. It is important to make clear that even if the unleashing of Bruno constituted the application of deadly force against Mr. Rosa, it would not have been excessive force if Officer Proulx had *probable cause* to believe that Mr. Rosa posed a significant threat of serious bodily harm to themselves or to others. If he had *probable cause* to believe Mr. Rosa posed such a threat, the use of deadly force to prevent his escape would have been objectively reasonable under Garner.

It is clearly established that "the use of excessive force by police officers in an arrest violates the arrestee's Fourth Amendment right to be free from an unreasonable seizure." White v. Pierce County, 797 F.2d 812, 816 (9th Cir. 1986). "The reasonableness of force is analyzed in light of such factors as the requirements for the officer's safety, the motivation for the arrest, and the extent of the injury inflicted." Id. This analysis applies to any arrest situation where force is used, whether it involves physical restraint, use of a baton, use of a gun, or *use of a dog*. **Police canines are weapons**. The Fourth Amendment requires that an officer's use of force be reasonable regardless whether the force involves "physical restraint, use of a baton, use of a gun, or use of a dog". Mendoza, No. 92-56225, slip op. at 5024. Police officers use deadly force when confronted by attacking canines during search and arrest warrant entries. From time to time we hear about altercations with dogs, usually around drug houses being raided. The use of a canine to attempt to apprehend or seize a civilian is a use of force. Special precautions are required to ensure that such force is not used unnecessarily or unreasonably. A canine should be deployed to apprehend or seize an individual only where: (a) the individual is suspected of having committed a serious or violent felony, (b) less potentially injurious techniques are insufficient, and (c) unless it is precluded by officer safety, a verbal warning is given prior to deployment and a supervisor's approval is obtained. Agencies should train their canines to follow the approach of "find and bark," rather than "find and bite." To the extent possible, the review of use of force incidents and use of force reports should include an examination of the police tactics and precipitating events that led to the use of force, so that agencies can evaluate whether any revisions to training or practices are necessary. To the extent possible, the review of use of force incidents and use of force reports should include an examination of the police tactics and precipitating events that led to the use of force, so that agencies can evaluate whether any revisions to training or practices are necessary.

It is my **opinion** to a reasonable degree of professional certainty that the use of a police canine Bruno to attempt to apprehend or seize a civilian is a use of force that should be deployed to apprehend or seize an individual only where: (a) the individual is suspected of having committed a serious or violent felony and (b) less potentially injurious techniques are insufficient, and (c) unless it is precluded by officer safety, a verbal warning is given prior to deployment. Officer Proulx with gun in one hand and Canine Bruno in the other hand commanded Bruno to "Bite and hold" Mr. Rosa rather then use less injurious reasonable and feasible Restraint and Control techniques.

My *fee structure* is as follows: Analysis of reports and documents, inspection of involved incident and/or crime scenes, travel, research, interviews, conferences, report writing and preparation for trials, hearings, depositions, review and correction of depositions, will all be billed at the hourly rate of $125.00. Out of state testimony including depositions, hearings and trials will be billed for an eight-hour day at the hourly rate of $175.00 ($1,400.00) for each day or part thereof. In state will be billed at a four hour allotted time plus expenses ($700.00). Additional hours will be billed at the hourly rate of $175.00

Dated: September __30TH__, 2002    REGINALD F. ALLARD, JR.

Sworn to before me this __30__ th day of September, 2002    NOTARY PUBLIC
Comm exp 3-31-2007

*Reginald F. Allard, Jr. – Expert Opinion Report - September 30, 2002*    11


**Reginald F Allard Jr.**
350 Rockwood Drive
Southington, Connecticut  06489
Tel(860)621-1013 - FAX(860)621-1013
E-Mail: regallard@aol.com
Website: http://www.expertcop.com
Website: http://expertcoplaw.com

**SUMMARY SKILLS:**
- Experienced leader, trainer, and educator.
- Working knowledge of the principles, methods, and practices in law enforcement.
- Proven experienced skills, knowledge, and application of crisis management techniques and critical decision-making.
- Qualified expert witness in both federal and state court for police use of force, procedures/practices, and training standards.

**EDUCATION:**
- **M.S. Criminal Justice,** University of New Haven, West Haven, Connecticut-1978
  3.6 Q.P.R.
- **B.A. Psychology,** Central Connecticut State University, New Britain, Connecticut 1972 3.2.Q.P.R.
- **Organizational Management - Testing, Measurement, & Counseling,** University of Hartford/Southern Connecticut State University, 1980/81
  25 Master credit hours completed.

**EXPERIENCE:**

**1984 Dec to Present**
*Training Officer* - Connecticut Police Academy - P.O.S.T., 285 Preston Avenue, Meriden, Connecticut 06450. Prepare & conduct recruit & in-service training programs. Specialist with full authority & responsibility for Arrest Mechanics/Officer Safety/Use of Force, Chemical agents(OC, CN, CS), Shooting Decisions, Domestic Violence, Laws of Arrest, Police Authority/Discretion, Suicide Intervention, Stress Management and Firearms Training. Research & lesson Plan development. Counsel and evaluate recruits. Co-ordinator for Basic Recruit sessions. To date, in excess of 11,000 recruit & in-service police officers trained.

**Leave of Absence - Feb 1989 to Aug 1989**
*Police Lieutenant/Patrol Commander* - Woodbridge Police Department, 4 Meetinghouse Lane, Woodbridge, Connecticut.
Responsible for the patrol and training function of a 29 member department. Oversaw the function/duties as well as ensure discipline of subordinates as they enforced law enforcement duties and responsibilities. Authored and implemented policies in police procedures and tactics.

*Rev:02/2002*

1

REGINALD F. ALLARD, JR

### 1982 Dec to Jan 1985
**Police Sergeant** - New Britain Police Department, 125 Columbus Blvd., New Britain, Connecticut 06050 Direct line supervisor/shift commander for a 30-person compliment of patrol officers and detectives. Discretionary review of law enforcement decisions. Prisoner control oversight and report review. Crime scene supervision and coordination of apprehension procedures. Recruit and in-service training in Search & Seizure and Patrol procedures.

### 1982 May to Dec 1982
**Police Detective** -New Britain, Connecticut police Department. Investigation of homicides, robbery, burglary, larceny, and assaults. Preparation of arrest warrants and search warrants. Interview of witnesses and interrogation of suspects. Collection/preservation of evidence. Courtroom testimony as to the investigations conducted.

### 1973 Oct to May 1982
**Police Officer** -New Britain, Connecticut Police Department. Interpersonal conflict management, criminal investigation, violator apprehension and victim trauma assistance. Neutralize verbal/physical aggression as personal and social freedoms were balanced with Constitutional Law, Penal Code Law, and Civil Law.

### 1979 Sept to 1981 Dec
**College Instructor** - Manchester Community College, 60 Bidwell Street, Manchester, Connecticut 06040. Research and development of lecture material in Psychology and Criminal Justice courses. Development of a conducive and productive learning environment along with effective student evaluation and testing.

### 1988 to 1994
**Instructor** - Connecticut Criminal Law Foundation, Inc. Judge Milton A. Fishman Foundation for Criminal Justice Training - 856 Farmington Avenue - Suite 221 West Hartford, Connecticut 06119. Re-certification for in-service police training conducted in **Shooting Decisions, Critical Incident Response Tactics & Procedure, Suicide Intervention Techniques & Domestic Violence Response Procedures.**

2

REGINALD F. ALLARD, JR

**September 1994**
***Consultant*** - U. S. Department of Justice, Suite 700 1255 22nd Street, N.W. Washington, D.C. 20037 % Michael Berkow, Project Manager, Haiti National Police Project(202)-653-9122 International Criminal Investigative Training Assistance Program ( ICITAP ) contracted with EBON Research Systems to conduct police training for Haitian Internees at Guantanamo Bay, Cuba as part of Operation Restore Democracy. As a member of a training consultant team, conducted training courses in Basic Human Rights, Police Ethics, Mechanics of Arrest, Defensive Tactics. Developed a Crowd Control module and a Field Training Officer module to implement subsequent to the preliminary course work.

## PUBLICATIONS

**Report Writing For the Use of Force** - Municipal Police Training Council Publication. January - 1989

**Why Police Officers Die.** CrimeBeat Magazine Aug. 1991.

**"Objectively Unreasonable Handcuffing"** Law and Order April 1991.

**"Death Data - Analyzing Statistics for Tactical Awareness"** The Police Marksman March/April 1991.

**The Fleeing Felon's "Back Sanctuary"** Law & Order   March 1993

**Unreasonable Risk Confrontation - A Fourth Amendment Violation**
Law & Order - July 1993

**"At Their Own Risk - Sub Suo Periculo"** Police News - NEOA
May-1993 Connecticut Police Academy - Training Bulletin
August - 1993

**"Recruit Equipment Must Be Duty Equipment"**
Connecticut Police Academy - Training Bulletin February - 1992

**"The Three Thousand Pound Bullet - A Tactical Dilemma"**
Connecticut Police Academy - Training Bulletin Vol.2, No.2 April - 1992

**"PSRC Position on Training & Equipment for DMH Officers"**
Position Paper PSEC Representative for Department of Mental Health Regarding Weapons Protective Services Employees Coalition - Newsletter
Vol.8 No. 3 December 1992

**"Plain Touch Doctrine"** Police News - NEOA September 1993 Vol. 4, Num. 9

**"Officer Safety - A Fourteenth Amendment Consideration "** Law & Order
September - 1994

**Model Policies - Use of Force** Connecticut Law Enforcement Foundation. Video Tape. June 1995

**Editor - Connecticut Police Academy - Training Bulletin**

**Web Page Design** - Connecticut Police Academy http://www.post.state.ct.us

3