1

```
 1              UNITED STATES DISTRICT COURT
                 DISTRICT OF CONNECTICUT
 2

 3   PABLO ROSA,
            Plaintiff

 4   VS.                        Civil Action Number
                                3:00CV1367 (WWE)
 5

 6   TOWN OF EAST HARTFORD, ET AL      December 4, 2002
                 Defendants.

 7

 8              DEPOSITION OF REGINALD F. ALLARD, JR.

 9

10   A P P E A R A N C E S:

11

12      EISENBERG, ANDERSON, MICHALIK & LYNCH
              Attorneys for the Plaintiff
13            136 West Main Street, P.O. Box 2950
              New Britain, Connecticut 06050-2950
14      BY:  DAVID K. JAFFE, ESQUIRE

15      HOWD & LUDORF
              Attorneys for the Defendants
16            65 Wethersfield Avenue
              Hartford, Connecticut 06114
17      BY:  DANIEL C. DeMERCHANT, ESQUIRE

18

19                   DEBORAH L. MILLS
                LICENSED COURT REPORTER No. 141
20                   NOTARY PUBLIC

21      NIZIANKIEWICZ & MILLER REPORTING SERVICES

22

23

24

25
```

4

1   many times have you been deposed in a case with a claim of

2   excessive use of force?

3       A.   I would say about sixty percent of those events.

4       Q.   And of those approximate sixty percent of those 33

5   to 35 cases, how many of those cases involved the use of a

6   canine?

7       A.   Just this one.

8       Q.   And with respect to court appearances, do you

9   recall or can you give me an approximation as to

10  approximately how many times you appeared and testified in

11  court with respect to the use of force cases?

12      A.   Again, out of that 30 to 35 depositions and trial

13  times, I would say that actual trial testimony occurred about

14  ten or twelve times.

15      Q.   Again, out of those ten or twelve times they would

16  not involve canine use of force?

17      A.   That is correct.

18      Q.   Have you ever offered an expert opinion on any case

19  that you have been retained as an expert, an expert opinion

20  concerning the use of force as it pertains to police canines,

21  other than this one?

22      A.   Other than this one, no.

23      Q.   Have you ever been retained by Attorney Jaffe

24  before today or before this case?

25      A.   Yes.

9

1    BY MR. DeMERCHANT:

2        Q.    Mr. Allard, you consider yourself to be an expert

3    in the field of police use of force?

4        A.    Approximately 35 times I have been so deemed as

5    one, and I have trained over 11,000 officers in the concepts

6    of use of force and I do travel multiple numbers of states in

7    the United States and so have testified in cases that deal

8    with the use of force and I have been designated by the

9    respective judges to be an expert in that matter.

10       Q.    Have you ever been designated by a judge in any

11   case as an expert in the use of force pertaining to canines?

12       A.    Pertaining to canines, no.

13       Q.    Have you ever had any past training, seminars,

14   lectures of any kind with respect to use of force of police

15   canines?

16       A.    Yes.

17       Q.    Okay.  Can you expound upon that, please?

18       A.    The use of force is generic under Graham v. Conner.

19   Any time I have training that speaks to the use of force by a

20   police officer, the weapon of choice is part and parcel the

21   decision to cause that level of trauma to that subject based

22   upon a perception of resistance.  So the canine is a use of

23   force tool just like a pistol is, just like a baton is, just

24   like OC is, just like his or her hands are, just like police

25   persuasion, advice of warning are, and the other multiple

11

1    did it not?

2        A.    Yes, it did.

3        Q.    Have you ever given any instruction on canine use

4    of force in any of your seminars that you have conducted or

5    training?

6        A.    Yes.

7        Q.    Where would that be?

8        A.    That would be at the Connecticut Police Academy.

9        Q.    And would there be a name of this course or

10   training session?

11       A.    Use of force.

12       Q.    You specifically train police officers in canine

13   use of force?

14       A.    I specifically mention that canines are a use of

15   force.

16       Q.    Anything else?

17             MR. JAFFE: Object to the form.

18             MR. DeMERCHANT: I'll strike that.

19   BY MR. DeMERCHANT:

20       Q.    Other than mentioning that canines are a use of

21   force in your training of these police officers, do you go in

22   depth with any other use of force of canines, how it is

23   recognized?

24             MR. JAFFE: October to the form.

25       A.    The placement of canine use of force is at the

13

1    and control, firearms, crisis intervention, human behavior,

2    abnormal behavior, and as my career expanded, I transitioned

3    into other courses where I have now 23 different topical

4    areas in which I am a certified law enforcement instructor in

5    which I teach both recruits as well as inservice personnel

6    from the State of Connecticut.

7            My primary duties today are in restraint and

8    control and use of force and in firearms and in shooting

9    decisions, crowd control, several other topics that escape me

10   at the moment, and I have trained in excess of 11,000 police

11   officers now in those 23 topical areas, both at the recruit

12   and inservice level.  My principal responsibilities are to

13   take those topical areas as assigned and then to develop

14   curriculum and lesson plans that suit the needs of the POST

15   council so that the presentation to both recruit and

16   inservice can prepare them to meet the job needs of that

17   particular officer.

18       Q.   Now, the Connecticut State Police employs canine

19   handlers, correct?

20       A.   That is correct.

21       Q.   And would they go to the Connecticut State Police

22   Academy to learn canine handling and the use of force with

23   canines?

24       A.    It is my understanding that there is a separate 14

25   week Connecticut State Police canine training division that

14

1   is at the complex in Meriden.  They do do some training at

2   the Connecticut Police Academy which they call the

3   Connecticut State Police Academy, and they do do some

4   training there, but not actual canine training, the actual

5   physical canine training is done at the complex or was done

6   at the complex before it was moved to Cheshire.  There was a

7   complex in Meriden and they moved that complex to a complex

8   in Cheshire.  That is where they do their principal 14 week

9   canine training.  The Connecticut State Police at their

10  recruit level are trained in use of force and then they

11  incorporate that use of force training into the utilization

12  of their canine tool of force.

13       Q.   If you know, do they instruct in canine use of

14  force at the State Police Canine Unit?

15       A.   Through an understanding of their A & O manual,

16  yes, they do teach canines and they do teach it as a tool of

17  force.

18       Q.   And do you have any manuals from the Connecticut

19  State Police Canine Unit with respect to their instruction on

20  use of force with canines?

21       A.   I have excerpts of the A & O manual, correct.

22       Q.   Do you have that with you here today?

23       A.   Yes, I do.

24       Q.   If I may see that, please?

25            MR. JAFFE: What word did you use, of their what

NIZIANKIEWICZ & MILLER REPORTING SERVICES

19

1  case?

2      A.    I believe thnrough a telephone conversation with

3  Attorney Jaffe.

4      Q.    Do you recall what information was conveyed to you

5  at that time concerning this case?

6      A.    A general thumbnail presentation of the facts of an

7  incident in which a plaintiff was bitten by a canine and then

8  a somewhat broad brush understanding of the facts as

9  presented and there was an incident in East Hartford in which

10  a canine handler and another officer were involved and a

11  plaintiff was bitten by a canine and some general

12  understanding of facts, and then I needed the other police,

13  the police record or the police reports as well as

14  depositions to fully understand that, and then that material

15  was forwarded and then I gleaned from that record what the

16  facts were at that point.

17      Q.    What was that general understanding of facts that

18  were conveyed to you?

19      A.    That there was a plaintiff that was bitten severely

20  by a canine under circumstances in which the fact pattern was

21  confusing and as a consequence the canine was either released

22  or let loose at some point in time and there was a fact

23  pattern dispute as to whether or not the canine was released

24  on an appropriate person and determining whether or not this

25  person was an armed and dangerous fleeing felon as opposed to

1   were shaped from the record that I had before me, both

2   discovery as well as my 29 years in police experience.

3       Q.    How long did you spend in actually preparing the

4   report? By preparing your report -- I know there's an

5   objection coming up.

6           MR. JAFFE: I am not objecting, I just, it would

7   help to clarify.  You mean actually typing it or do you mean

8   everything?

9   BY MR. DeMERCHANT:

10      Q.    Let's break it down.  I did mean everything, but

11  let's break it down.  How much time did you spend in

12  performing research, obtaining documents, and reviewing

13  documents before developing your final opinions in this case?

14      A.    Nineteen hours of case material review, seven hours

15  of research and preparation of the report, a total of 26

16  hours as of September 30th, 2002.

17      Q.    Now, you have done additional work since reaching

18  your final opinions, excuse me, upon reaching your opinions

19  that are expressed in your September 30th, 2002 report?

20      A.    Yes.

21      Q.    What have you done?

22      A.    Continued to review the legal research as it

23  relates to use of force in general and canine specifically,

24  as well as having been provided recent discovery material,

25  reviewed that material in preparation for today's deposition.

NIZIANKIEWICZ & MILLER REPORTING SERVICES

36

1    incident and subsequent to that new discovery and a study of

2    that to determine whether or not from that information and

3    the newspaper articles of previous instances whether or not

4    the generally accepted practice and procedure in the City of

5    East Hartford was to allow the unleashing of dogs in an

6    inappropriate manner.

7        Q.    With respect to your report, pertaining to the

8    conduct of Officer Proulx and your opinions based on that

9    issue alone, would that be your opinions expressed in that

10   issue -- strike that.

11           Looking solely at your opinions expressed

12   concerning Officer Proulx's conduct on the night in question

13   as reflected in your report of September 30th, are those your

14   final opinions?

15           MR. JAFFE: Could you do me a favor?  I couldn't

16   hear the whole question because of the phone.

17           MR. DeMERCHANT: You want me to repeat the question?

18           MR. JAFFE: Or read it back.

19           MR. DeMERCHANT: I'll repeat it, it will be easier.

20   BY MR. DeMERCHANT:

21       Q.    Looking solely at the conduct of Officer Proulx and

22   your opinions on that issue as expressed in your report of

23   September 30th, 2002, are those your final opinions

24   concerning that issue?

25       A.    To date my opinions are living opinions and as new

NIZIANKIEWICZ & MILLER REPORTING SERVICES

37

1    discovery becomes available it either may support my opinion,

2    adjust my opinion, or outright change my opinion.

3         Q.   Are you planning to do any additional work-up

4    concerning that issue?

5              MR. JAFFE: Object to the form.

6         A.   As more and more discovery becomes available and as

7    it is presented to me and as I review the record on an

8    ongoing basis between now and trial and as I review case

9    history, case law history, then my opinion will either be

10   modified, not modified, enhanced upon or outright pulled from

11   the opinion file.

12        Q.   Let's get right into your opinions in this case.

13   What are your final opinions or your opinions present day, I

14   guess I should say, with respect to the defendant Officer

15   Proulx's use of force in this case?

16             MR. JAFFE: Object to the form.

17        A.   As a broad brush response to that question, Officer

18   Proulx unreasonably, objectively unreasonably in a fashion

19   that does not conform to a reasonable, prudent police officer

20   released his canine and caused serious physical injury to

21   plaintiff Pablo Rosa without necessity and without

22   appropriate reasonableness.

23        Q.   Now, you understand that there is conflicting

24   testimony or at least conflicting versions of how this

25   incident took place?

38

1     A.   That is correct.

2     Q.   And you gave me your opinions concerning Officer

3  Proulx's conduct in a general manner, or excuse me, a general

4  sense of what your opinions were.  Can you in a general way

5  disclose what factual events -- strike that.

6        Let me go back.  Now, with respect to that opinion

7  that you just gave me, what happenings, what is your

8  understanding of the happenings on that evening that you base

9  your opinions upon?

10        MR. JAFFE: Object to the form.

11     A.   You are asking me to convolute the various fact

12  patterns?

13     Q.   Well, you just gave me --

14     A.   I'll convolute those various fact patterns, and as

15  I convolute them, the decision action is going to change.

16  What happened is you had the East Hartford Police Department

17  receive a complaint of a disturbance, a fight in progress, at

18  140 Silver Lane on November 26, 1998, on or about 7:03 p.m.,

19  third floor, a dispute call, no weapons, possible weapons,

20  four Hispanic males and no weapons.  You had two officers

21  responding, Officer Proulx and Officer McGeogh.  They

22  respond, they arrive at that scene and either you have a

23  woman at the outside door or you don't, the officers are then

24  going up to the third floor, either the dog is going up, the

25  canine Bruno is going up by himself in one stair pattern and

40

1    conflict of testimony from five seconds, several minutes,

2    conflict of testimony as to whether or not there was

3    resistance to being bitten by the dog that results in the

4    serious injury sustained by Pablo Rosa, confusion as to

5    whether or not Pablo Rosa is handcuffed at the time while he

6    is being bitten or he is not being bitten and he is

7    handcuffed, confusion as to the number of people in that

8    hallway, whether or not there was a disturbance or there was

9    a disturbance active, how much time elapsed from the time the

10   officers arrived on the third floor.

11        Q.   I guess I understand that the facts or testimony or

12   versions from different people in this case are very

13   different in part from one another, but you gave a general

14   opinion that Officer Proulx, an objective outlook on this,

15   acted unreasonably, and I want to know what facts you base

16   that on?

17        A.   Given that confusion of the fact pattern, given the

18   lack of corroboration of threat, Officer Proulx should not

19   have released his dog onto Pablo Rosa or anyone at that time

20   at the 140 Silver Lane apartments or the third floor.

21        Q.   That would be true even if Pablo Rosa was evading

22   arrest by fleeing?

23        A.   It is a minor misdemeanor offense, you shouldn't

24   release a dog on a minor misdemeanor offense if you had

25   fleeing.

42

1      Q.    Now, are you offering an opinion with respect to

2    the difference of policies on bite and hold versus bite and

3    bark?  Strike that.

4      A.    Find and bark?

5      Q.    Find and bark is what I was referring to. Let me

6    ask the question again, I was reading and talking at the same

7    time and I shouldn't do that.

8           Are you here today to offer an opinion with respect

9    to the policies or difference between the policies of bite

10   and hold and find and bark?

11     A.    Yes.

12     Q.    Okay.  And what are those opinions that you share?

13          MR. JAFFE: October to the form.

14     A.    Find and bark there is no use of force other than

15   the barking of the dog.  Bite and hold you have force

16   applied, so as a consequence you have increased the use of

17   force.

18     Q.    Do you have any opinion as to the appropriateness

19   of training and use of either or?

20     A.    Yes.

21     Q.    What would that be?

22     A.    The majority --

23          MR. JAFFE: Object to the form.

24     A.    The majority of use by canine units should be at

25   the level of find and bark, rather than bite and hold.  The

43

1    application of the teeth into a human being causes injury.

2    There are times when you just want to find the person, warn

3    him through the barking, like an officer would warn a person,

4    to comply prior to applying the use of force.   The canine is

5    a use of force and prior to using force in the case of a

6    canine you bark first, find and bark, and then you escalate

7    up to the bite and hold when it becomes reasonable and

8    necessary.

9         Q.   And under what circumstances are reasonable and

10   necessary?

11             MR. JAFFE: Object to the form.

12        A.   Again, the fact pattern would have to represent to

13   an officer that he is facing bite consequences threat, and if

14   he is facing bite consequences threat, then the officer is

15   appropriate in the use of that canine.   If I could punch the

16   individual, if I could hit the individual with a baton,

17   there's a hightened understanding that a dog bite itself is

18   above that of a baton strike.

19        Q.   Where did you obtain that from?

20        A.   From Caliber Press, they have an aappreciation for

21   their force model on how they see various tools and how they

22   reference this use of tools as it relates to resulting

23   injury.   Any tool that a police officer uses has to be based

24   in his or her understanding of the consequences of the

25   enforcement of that tool or use of that tool and in the case

46

    Q.   Let me see if I can find this.  I thought I marked
this better than what I did. I did mark it, my apologies.

         Do you see in the second paragraph down where it
starts "Good judgment?"

    A.   Yes.

    Q.   And if you go down further, let's see here, it is
the second to the last paragraph where it reads, "As such
canine training places the use of police service dogs under
the legal guidance of the Supreme Court decision in Graham
versus Conner and Tennessee v. Garner," do you see that
there?

    A.   Yes, I do.

    Q.   Do you believe that Tennessee v. Garner is an
applicable case that applies to canines in general, the use
of force?

    A.   The use of canines in and of itself is not the use
of deadly physical force or deadly force, but it can result
in deadly force, thus Tennessee v. Garner is part of the
decision process as it relates to releasing a canine.

    Q.   Do you have any authority for that opinion, sir?

    A.   Yes.

    Q.   What authority would that be?

    A.   Graham v. Conners.

    Q.   Graham v. Conners is law that provides that
Tennessee versus Garner would apply in canine use of force

67

1          Now, going back to your report and based on what I

2     had just read, Mr. Allard, that last sentence that we had

3     just read, when faced with a minor misdemeanor offense, do

4     you see that in your report that we were just referencing to,

5     page eight, second paragraph, last sentence of your report.

6          MR. JAFFE: Of his report?  You are looking at the

7     wrong thing (to witness.)

8          A.   Okay, I am there on page eight of my report, what

9     was the question?

10    BY MR.DeMERCHANT:

11         Q.   I am, in reference to again with that sentence

12    that we discussed earlier where it reads, the last sentence

13    in your second paragraph on the page eight of your report,

14    where it says, "Officer Proulx unleashed canine Bruno when

15    faced with a minor misdemeanor offense,"  do you see that

16    there?

17         A.   Yes.  It is my opinion to a reasonable degree of

18    professional certainty that Officer Proulx unleashed canine

19    Bruno when faced with a minor misdemeanor offense, if one

20    believes the facts articulated by Officer Proulx and McGeogh.

21         Q.   Okay.  Now, in reference to that sentence and

22    explicitly focused on "minor misdemeanor offense," were you,

23    are you relating that in any way to the IACP policy that I

24    had just read, number four, the severity of the crime?

25         A.   That and in conjunction with the IACP model policy

95

CERTIFICATE

STATE OF CONNECTICUT :

                    SS

COUNTY OF TOLLAND    :

         I, Deborah L. Mills, a licensed court reporter

within and for the State of Connecticut, do hereby certify

that the deposition of REGINALD F. ALLARD, JR., was taken

before me pursuant to The Federal Rules of Civil Procedure,

at the offices of Eisenberg, Anderson, Michalik & Lynch, 136

West Main Street, New Britain, Connecticut, commencing at

1:30 p.m. on December 4, 2002.

         I further certify that the witness was first sworn by me

to tell the truth, the whole truth, and nothing but the

truth, and was examined by counsel, and his testimony

stenographically reported by me and subsequently transcribed

as hereinbefore appears.

         I further certify that I am not related to the parties

hereto or their counsel, and that I am not in any way

interested in the event of said cause.

         Dated at Tolland, Connecticut, this 5th day of December,

2002.

         Deborah L. Mills, Notary Public

My Commission Expires:

June 30, 2005