```
                                                              1

 1              UNITED STATES DISTRICT COURT
                  DISTRICT OF CONNECTICUT
 2
     PABLO ROSA,
 3        Plaintiff

 4   VS.                          Civil Action Number
                                    3:00CV1367 (WWE)
 5
     TOWN OF EAST HARTFORD, ET AL    December 23, 2002
 6        Defendants.

 7

 8              DEPOSITION OF PAUL CHACE

 9

10   A P P E A R A N C E S:

11

       EISENBERG, ANDERSON, MICHALIK & LYNCH
12          Attorneys for the Plaintiff
            136 West Main Street, P.O. Box 2950
13          New Britain, Connecticut 06050-2950
       BY:  DAVID K. JAFFE, ESQUIRE
14
       HOWD & LUDORF
15          Attorneys for the Defendants
            65 Wethersfield Avenue
16          Hartford, Connecticut 06114
       BY:  DANIEL C. DeMERCHANT, ESQUIRE
17

18
                         DEBORAH L. MILLS
19              LICENSED COURT REPORTER No. 141
                        NOTARY PUBLIC
20

21       NIZIANKIEWICZ & MILLER REPORTING SERVICES

22

23

24

25
```

59

CERTIFICATE

1  
2  STATE OF CONNECTICUT :
3                       SS
4  COUNTY OF TOLLAND    :

5      I, Deborah L. Mills, a licensed court reporter within and for the State of Connecticut, do hereby certify that the deposition of PAUL CHACE, was taken before me pursuant to the Federal Rules of Civil Procedure, at Eisenberg & Anderson, 136 Main Street, New Britain, Connecticut, commencing at 3:17 p.m. on December 23, 2002.

     I further certify that the witness was first sworn by me to tell the truth, the whole truth, and nothing but the truth, and was examined by counsel, and his testimony stenographically reported by me and subsequently transcribed as hereinbefore appears.

     I further certify that I am not related to the parties hereto or their counsel, and that I am not in any way interested in the event of said cause.

     Dated at Tolland, Connecticut, this 4th day of February, 2003.

        _____
        Deborah L. Mills, Notary Public  Copy

My Commission Expires:
June 30, 2005

1  can't call myself a specialist. You know, I practiced for
2  seventeen years, so that gives me quite a bit of expertise,
3  but there are certainly boarded specialists in certain areas
4  have more knowledge than I do.
5      Q. Can you describe your practice for me?
6      A. We have a general practice, cat, dog and as you can
7  see from the CV, I do a lot of exotic animal practice.
8  Approximately 50 percent of our cases are dogs, the practice
9  is a little bit greater but because I have the exotic share,
10 mine actually is a little under 50 percent. The second most
11 common things is the cats, and my exotics that I see run
12 probably about ten percent of the patients that I see.
13     Q. Do you specialize in any type of field in the
14 veterinarian medicine?
15     A. No, I am not a specialist.
16     Q. Have you ever authored any articles or books
17 regarding canine dog bites?
18     A. I have not.
19     Q. We had what has been marked as Defendant's Exhibit
20 2 for identification, sir, a report from you dated October 2,
21 2002, and I am going to ask you just to take a look at that,
22 sir.
23     A. Okay.
24     Q. Is that your report? Does this report of October
25 2nd, 2002 contain your opinions made in this case?

8

1  A.   Yes, it does.

2  Q.   Okay. Now, looking at this report, Defendant's
3  Exhibit 2, it provides in the third paragraph, which I am
4  going to show you, and I apologize, it is my only copy I
5  have, it provides that, "Based upon my background as a
6  veterinarian and referenced in my attached curriculum vitae,
7  my knowledge of dog bites within my practice as a surgeon
8  wherein almost 50 percent of my patients are dogs of some
9  kind," do you see that there?

10 A.   Yes.

11 Q.   I guess my question is with respect to the 50
12 percent of your patients that are dogs of some kind, if you
13 can, what generally do you see the dogs for when they come to
14 your practice?

15 A.   Well, we are a full practice, so we see them for a
16 range of problems. I mean, if you are asking what is the
17 most common thing we do is preventative medicine, vaccines
18 and spays and neuters, but with the amount of emergency
19 practice I have done in the past and still do, you know, bite
20 wounds are, you know, a part of that, and both seeing them in
21 people, clients, staff members, other animals that we see
22 certainly account for the basis of that statement.

23 Q.   Okay. We will discuss that a little bit further.
24 Do you recall when you were first contacted in this case
25 to -- sorry.

1  Q.  Okay.  Just briefly, I just want to go back to your
2  actual practice.  Do you recall, if you know, what percentage
3  of your practice is where you treat police dogs?
4  A.  No, I don't know.  I can tell you offhand we had
5  two state police dogs that we treated.  I don't believe we
6  have any town police or city police dogs that I am aware of
7  that we treated.
8  Q.  Did your treatment of these two state police dogs
9  involve dog bites?
10 A.  No, because they are the ones doing the biting,
11 they are not the ones that are getting bit typically.  We
12 have treated them for gunshot wounds, we have treated them
13 for miscellaneous veterinary things, but never another dog
14 biting a police dog.
15      MR. JAFFE:  Is that what you meant, another dog
16 biting a police dog, or treating them for them biting
17 someone?
18      MR. DeMERCHANT:  I just wanted to know what they
19 treated them for.
20 BY MR. DeMERCHANT:
21 Q.  I can't even remember my question, but you did
22 answer what I wanted to know, so thank you.
23      What did you do to assist you in arriving at your
24 opinions in this case?
25 A.  What did I do to assist?

22

1  photographs, three being duplicates.
2  BY MR. DeMERCHANT:
3      Q.   Dr. Chace, based on your recollection are there any
4  other photographs that you have reviewed in assisting you in
5  arriving at your opinions in this case other than the
6  photographs that you have seen here today including the three
7  police photographs that had been previously shown to you?
8      A.   No.
9      Q.   Now, Dr. Chace, is this your entire file?
10     A.   Yes, it is.
11     Q.   Other than the photographs that we have just
12 reviewed, has anything been removed?
13     A.   No.
14         MR. JAFFE:  I am not so sure that they were
15 removed, he may have never, he may have seen them and --
16         MR. DeMERCHANT: I don't mean any negative
17 connotation, but there's no photographs in there.
18         MR. JAFFE:  As long as you are not implying he
19 removed the photographs. That was probably a coincidence.
20         MR. DeMERCHANT: It is perfectly understandable you
21 wouldn't retain the photographs versus having them in his
22 file.
23 BY MR. DeMERCHANT:
24     Q.   And your opinions that you arrived at in this case
25 are based on the materials in your file and the photographs

23

1  that we reviewed and nothing else?
2     A.   Well, personal experience with other bite wounds in
3  both people and animals, so, you know, I have a background in
4  first aid and multiple courses in human physiology and wound
5  management, so there's a lot of academics behind this opinion
6  also.
7     Q.   And I am sorry, you said human physiology?
8     A.   Physiology, yes, part of my preveterinarian
9  studies. There's a lot of crossover between human and
10 veterinary classes and I ended up taking a lot of classes
11 with premeds as kind of proving yourself so they know what
12 they are getting once you get into professional school.
13    Q.   What courses have you taken in human -- it's going
14 to be a nightmare me saying that. What courses had you taken
15 in human physiology?
16    A.   Basic human physiology, there is advanced human
17 physiology, freshman biology. I don't remember the specific
18 type, but it was an advanced biology course in my
19 undergraduate also.
20    Q.   When did you take these courses?
21    A.   Throughout my undergraduate career. My CV only
22 includes my professional career.
23    Q.   When, from what time frame was your undergraduate
24 career?
25    A.   From 1975 through 1978, 1979, I am sorry.

24

1  Q. Those opinions expressed in your report we have
2  marked as Exhibit 2, are those your final opinions in this
3  case?
4  A. Yes.
5  Q. Do you plan to do any additional work-up on this
6  case?
7  A. No, but I think in court we can demonstrate through
8  the use of models and so forth some of how I arrived at the
9  opinions I have.
10 Q. What models are you referring to?
11 A. One of the things that we can produce is a model
12 that is very similar in size to a German shepherd's bite, the
13 whole dental model for a dog of about the approximate size,
14 and it can demonstrate some of the effects that the teeth
15 have on the flesh, both the cutting and the crushing effects
16 that they have.
17 Q. Are you aware of the specific bite radius of the
18 German shepherd subject of this case?
19 A. I haven't seen actually measurements of it, but
20 from, you know, if you go from the average German shepherd
21 that I see as a police dog I could probably approximate it
22 fairly closely.
23 Q. Dr. Chace, before we go through your report, do you
24 have a basic understanding of what happened the night of
25 November 26, 1998, resulting in Pablo Rosa being bitten by a

30

1  that are depicted in Defendant's Exhibit 4 to the left of the
2  skin graft are different than the puncture wounds in
3  Defendant's Exhibit 3 for identification?
4      A.  Yes.
5      Q.  That are positioned above the skin graft?
6      A.  Yes, they are, they are definitely different.  You
7  can see there is quite a large space, and even with wound
8  contraction you are not going to get that great a space
9  between them.  It appears to be an additional bite wound that
10 doesn't show in the positioning of the photograph.
11     Q.  Based on these two photographs do you have an
12 opinion as to whether or not Pablo Rosa was bit more than two
13 times?
14     A.  I can't definitively say.
15         MR. JAFFE:  Object to the form.
16     A.  I mean, at least twice, but I can't comment as an
17 exact number.
18     Q.  Now, just for the record, you are not a medical
19 doctor, correct?
20     A.  I am not.
21     Q.  Okay.  You don't examine or medically treat humans,
22 correct?
23     A.  Only as a first aid measure.  I have had to treat a
24 number of my staff's bite wounds and, you know, before
25 sending them to the emergency clinic, but aside from that I

31

1  just applied first aid.
2      Q.  Have any of your staff ever been bitten by a canine
3  dog trained to bite and hold?
4      A.  Not to my knowledge.
5      Q.  Okay.  Other than the photographs we have here
6  today have you ever seen a photograph of an injury from a
7  police dog trained to bite and hold?
8      A.  Not recently.  I did see one earlier in my career.
9  Actually, can I clarify that?  Actually, I did not see the
10 photograph, I saw the wound itself.
11     Q.  When was that that you saw this wound from a canine
12 bite from a dog that was trained to bite and hold?
13     A.  It would have to have been between July of 1985 and
14 November of 1985, because that is when I was practicing in
15 Maine.
16     Q.  What were the circumstances that led up to you
17 reviewing this wound?
18     A.  I believe that it was just a client who wanted me
19 to see the wound that he had, you know, had indicated to me
20 that he had a run-in with the police and had been wrongly
21 attacked by the dog but, you know, he had just pulled up his
22 cuff and showed me his wound.
23     Q.  And can you describe that wound that you saw for
24 me?
25     A.  His was more of a, if I recall, had three puncture

32

1  wounds and no tearing at that point.

2  Q. Let's go on to number two, please. "Based on the
3  nature and severity of the wound, it is likely that any
4  biting of the calf took at least ten seconds and probably
5  longer than that." Do you see that there?

6  A. Yes.

7  Q. It is your opinion that as an expert veterinarian
8  you can look at a human wound and estimate the time a dog had
9  bitten that particular human?

10  A. You can make deductions based on the severity of
11  the wound, how the wound occurred, and based on that I am
12  thinking that this was more than a quick bite and hold, that
13  this was more of a prolonged type of injury rather than a
14  very sudden injury, and ten seconds I think is a reasonable
15  period of time to be required to at least sustain this kind
16  of injury. It would not be a very quick bite and release
17  type of an injury that you are seeing here.

18  Q. What background as a veterinarian assists you in
19  rendering that opinion?

20  A. More personal experience with a dog's type of
21  attacks. I mean, when you have a dog that is not trained to
22  do what these police dogs are, they tend to bite and come
23  back and bite again and come back and bite again, rather than
24  hold, and with the pet dogs, you know, having seen them bite
25  multiple times, you know, you get an approximate idea of what

33

1   it takes to do that kind of damage on a human leg.
2       Q.   You will agree a police dog trained to bite and
3   hold is different from a nontrained dog?
4       A.   Yes.
5       Q.   Other than that one time in July of 1985 or
6   November of 1985, about that time period, other than that one
7   time you have never seen a wound inflicted on a human by a
8   police dog trained to bite and hold?
9       A.   Correct.
10      Q.   How many human dog bites have you seen in the past,
11  if you know?
12      A.   Probably between 30 and 40 that I actually
13  witnessed.  I have seen a number of clients who have been
14  bitten prior to my actually seeing the wound, so I didn't
15  actually witness the wound or the biting itself, but those
16  will probably number over a hundred.
17      Q.   Did your opinion concerning a length of time Pablo
18  was bitten take into consideration whether or not Mr. Rosa
19  was trying to either kick the dog with the leg being bitten
20  or pull the leg away from the dog?
21      A.   It took into consideration the fact that there was
22  some struggling involved with any bite wound.  I don't know
23  that I considered actively that Mr. Rosa kicked the dog.  I
24  think based on, you know, what these photographs show me,
25  that you couldn't sustain this injury with a single bite

35

1  into consideration whether Pablo Rosa resisted during the dog
2  bite versus resisting the dog's bite?
3      A.  Yes.
4      Q.  Okay. And based on your opinion that the dog bite
5  took at least ten seconds and probably longer, that is based
6  on your, based on the consideration that Pablo Rosa was
7  resisting the dog's bite at the time being bitten?
8      A.  Yes.
9          MR. JAFFE:  Object to the form.
10 BY MR. DeMERCHANT:
11     Q.  Explain to me, if you can, exactly what you are
12 relying upon in the field of veterinary medicine to come up
13 with a time frame that Pablo Rosa was bitten by the police
14 dog?
15     A.  As far as the duration of the bite?
16     Q.  That is correct.
17     A.  Specifically it is my opinion --
18         MR. JAFFE:  I am going to object. By the way, you
19 didn't specify which bite, he said there was more than one.
20 BY MR. DeMERCHANT:
21     Q.  Let me rephrase the question for you. In your
22 report you have here, "Any biting of the calf took at least
23 ten seconds or probably longer than that," correct?
24     A.  Correct.
25     Q.  Okay. Based on that statement what experience or

1   background in veterinary medicine do you rely upon in
2   rendering that?
3       A.   There's several things that led to that conclusion
4   or that opinion.  One is that there was more than one bite
5   wound, I guess we have stated that, and secondly, there's a
6   tearing injury here that resulted in the necessity of a skin
7   graft.  Having one bite that showed very clear puncture
8   wounds and another one that was an abrading bite indicated to
9   me that there was, you know, more than one bite and that that
10  second bite was of a longer duration in order to do the
11  grinding and the tearing of the flesh that occurred there.
12  Having looked at the photographs it appears that it was held
13  or abraded for a period of time rather than, you don't get a
14  quick scrape and a release and have this extent of damage
15  done.  There had to be a great amount of pressure applied to
16  that, so I am thinking, it is my opinion that as this
17  abrasion occurred some amount of time passed, and I think ten
18  seconds is a reasonable amount of time for this single wound
19  alone, let alone other bites that occurred at that time.  So
20  it is from the extent of the wound, from the knowledge of the
21  physiology, the experience with other bites that I have seen
22  and the experience on my own that I concluded that.
23      Q.   Have you ever done or conducted any studies on dog
24  bites in the past?
25      A.   I have not.

37

1          MR. JAFFE:  It's a good idea, though.

2          MR. DeMERCHANT:  It certainly would be in this

3  case.

4          THE WITNESS: There is a lot of information out

5  there.

6          MR. JAFFE: No question pending.

7          THE WITNESS:  Okay.

8  BY MR. DeMERCHANT:

9      Q.   But you haven't done any research on dog bites or

10  anything of that nature to assist you in your opinions in

11  this case?

12      A.   No, I didn't feel it was my place to be consulting

13  to research it in order to conclude that.

14      Q.   Have you ever seen a dog bite that lasted at least

15  ten second before?

16      A.   Yes.

17      Q.   On a dog trained to bite and hold?

18      A.   No.

19      Q.   Have you ever seen dog wounds as severe as the

20  photographs that you have seen in that case, in Defendant's 3

21  and 4?

22      A.   Have I seen them personally?  I have seen one that

23  probably approaches the severity of this wound.  One of the

24  conferences I had dealt with wound healing and some of them

25  were actually on people rather than animals, and that was the

41

1  immediately?
2       A.   The amount of tissue lost on the front of the leg
3  brought me to that conclusion, and then if you look at the
4  other photographs, they are showing bite wounds into the
5  flesh of the calf, of which there are arteries and veins that
6  would also tend to bleed through a bite wound from a dog.
7  There is a lot of tearing that goes on.  Even though there's
8  a singular wound on the surface, there's often a lot of
9  damage done below the surface.
10      Q.   You are relying upon the medical record of Dr. Reed
11 in obtaining that opinion?
12      A.   Partially.
13      Q.   You agree you don't rely upon the medical record of
14 an M.D. in your practice, do you?
15      A.   No.
16      Q.   You already testified you are not a medical doctor,
17 correct?
18      A.   Correct.
19      Q.   And you are rendering an opinion as to whether or
20 not a, let me get the terms down correctly, you are rendering
21 an opinion here today that a human being started bleeding
22 profusely almost immediately by reviewing a medical record
23 from an M.D., an ambulance report, and photographs?
24      A.   And personal experience.
25      Q.   Personal experience, what is that personal