LOIS Federal District Court Opinions

CASTILLO v. THE CITY OF ALBUQUERQUE, (N.M. 2002)

JIMMY CASTILLO, Plaintiff, v. THE CITY OF ALBUQUERQUE; OFFICER ANDREW LEHOCKEY (both in his official capacity as a police officer and individually); OFFICER MICHAEL SCHALLER (both in his official capacity as a police officer and individually), Defendants.

No. CIV 01-626 LFG/WWD

United States District Court, D. New Mexico

July 1, 2002

MEMORANDUM OPINION AND ORDER

LORENZO F. GARCIA, United States Magistrate Judge

   THIS MATTER is before the Court on cross motions for summary judgment. On June 14, 2002, Defendant Andrew Lehocky ("Lehocky") filed a Motion for Partial Summary Judgment No. V: Dismissal of Plaintiff's Entire Fourth Amendment Excessive Force Claim on the Basis of Qualified Immunity ("Lehocky's motion"). [Doc. 97.] Lehocky claims that Plaintiff Jimmy Castillo's ("Castillo") Fourth Amendment claim is subject to dismissal either because Castillo cannot meet the initial two-part qualified immunity inquiry and/or because he cannot raise a genuine issue of material fact as to the merits of the Fourth Amendment claim. [Doc. 98, p. 3.] Lehocky's motion is fully briefed. [Docs. 97-101.]

   On June 17, 2002, Castillo filed a Motion for Summary Judgment as to Defendant Andrew Lehocky ("Castillo's cross-motion"). [Doc. 102.] In his cross-motion, Castillo argues that there are no genuine issues of material fact with respect to whether Lehocky's conduct was "objectively reasonable" and that, therefore, Castillo is entitled to summary judgment on his Fourth Amendment excessive force claim. The issue of Lehocky's qualified immunity is argued in Castillo's cross motion as well as in Lehocky's motion. The cross motion is fully briefed. [Docs. 102-105.] No oral argument is necessary before deciding the cross motions.

   After careful consideration of the pertinent law, pleadings and attachments, the Court concludes that both Lehocky's motion and Castillo's cross-motion should be denied because there are genuine issues of material fact best left for a jury to determine.

Procedural Background

   The Court must first address the parties' improper presentation of their undisputed material facts in the cross-motions, which complicated, rather than simplified, matters. The parties are instructed, in the future, to prepare their motions in accordance with the appropriate rules of civil procedure. In addition, the parties are advised that the rules do not allow the incorporation of arguments from other related briefs, without permission of the Court. D.N.M. LR-Civ 7.1. Castillo's

EXHIBIT F

cross-motion presents 24 undisputed material facts [doc. 103, pp. 3-5], the majority of which are taken from Lehocky's contentions in the Initial Pre-Trial Report [IPTR, doc. 23, pp. 4-10]. Only a few of Castillo's proposed undisputed facts rely on deposition testimony by Castillo, Lehocky, and Sergeant Steve Hill. At the summary judgment stage, Castillo's reliance on the defendant's contentions as set forth in the IPTR is improper. A motion for summary judgment is intended to penetrate the allegations of the pleadings to determine if there is a triable fact. The existence of a triable issue should be demonstrated by pleadings, depositions, answers to written discovery, admissions on file, and supporting affidavits. Fed.R.Civ.P. 56(c). The facts contained in these materials must be admissible or usable at trial, a requirement that is not satisfied by a party's contentions or allegations. Fed.R.Civ.P. 56(c); see also Roche v. John Hancock Mut. Life Ins. Co., 81 F.3d 249, 253 (1st Cir. 1996) (Rule 56 motions are not determined on the parties' visions of what the facts may some day reveal). Thus, a party's contentions in the IPTR cannot serve as the basis of a Rule 56 motion.

After seeing Castillo's cross-motion and reliance on the IPTR contentions, Lehocky responds that he will stipulate to his contentions in the IPTR, as recited by Castillo, subject to several "caveats." [Doc. 104, p. 2.] One "caveat" is that under Federal Rule of Evidence 106, the "rule of completeness," other contentions in the IPTR should be accepted as fact.[fn1] Ultimately, Lehocky's "caveats" amount to an incorporation of 4 single-spaced pages of contentions in contrast with the 24 double-spaced undisputed facts proposed by Castillo.[fn2] [Id., pp. 4-8.] While the parties' supposed willingness to stipulate to (some of) Lehocky's contentions might have demonstrated compliance with Rule 56(c), Lehocky's "caveats" essentially swallow those "stipulations." In his reply brief [doc. 105], Castillo just ignores Lehocky's argument that he is presenting many more pages of "stipulations." Thus, Castillo's silence technically could be read to constitute agreement to the proposed 4 pages of "stipulations," but the Court declines to consider all of the IPTR contentions by Lehocky to be stipulations.

Further complicating the briefing is Lehocky's motion, in which counsel elects not to present any undisputed facts and merely states that he accepts those facts ("with caveats") presented in Castillo's cross-motion (again Lehocky's contentions in the IPTR) as the material undisputed facts for purposes of his own motion. [Doc. 98, pp. 2-3.] The moving party "must" initially set out a concise statement of all of the material facts as to which the party contends no genuine issue exists." D.N.M. LR-Civ 56.1(b). Here, neither party complied with the Rule's requirements. In addition, as stated previously, a party is not permitted to incorporate arguments from other briefs, without the Court's permission.

Castillo responds, that with respect to the qualified immunity argument, there are facts in addition to Lehocky's contentions that are critical to the court's determination. Castillo further asserts that these additional facts, which are supported by deposition testimony he attaches, are in "sharp dispute," thereby requiring the denial of Lehocky's motion. In his response, Castillo sets forth a short list of the critical facts he believes are in dispute that defeat Lehocky's motion. Lehocky replies that none of these additional facts are "material." The Court disagrees. Moreover, the parties' convoluted attempts to present or circumvent presenting the "undisputed" facts tend to belie their arguments that this case is subject to summary disposition.

Factual Background

The Court considered the following facts to be undisputed for purposes of

deciding the cross motions. In assembling these facts, the Court takes those contentions of Lehocky's that appear to be undisputed. On April 9, 2000, after a verbal disagreement with his adult step-son, Castillo left his home. At about 2 a.m. on April 10, Castillo's wife picked up Castillo near the Sandia Casino, after the BIA Police Department contacted and informed her that they had stopped Castillo for suspicion of driving while intoxicated. At home, Castillo retrieved a rifle and made statements to his wife to the effect that he wanted to kill himself. Castillo's wife left the house and went to a neighbor's home.

She subsequently heard what she believed was a gunshot coming from her house and contacted the Albuquerque Police Department. A little after 3 a.m., Officer Andrew Roberto was dispatched to Castillo's home. Castillo's wife informed Roberto of the events that had occurred, including that her husband was intoxicated, had threatened to harm himself, was diagnosed as a manic depressive, suffered from a terminal illness and was taking several prescription anti-depression medications. She also told the officer that Castillo still might be armed with a rifle. This information was relayed via radio to other APD officers and also communicated to SWAT team officers, including Lehocky and Schaller. At about 4 a.m., the SWAT team was called out to the Castillo residence, and crisis negotiators were advised of Castillo's mental and physical condition.

Crisis negotiator Detective Garcia made contact, via telephone, with Castillo who was inside the house. Garcia continued to talk to Castillo for about three hours. He asked Castillo to put his gun down, and Castillo did so. Castillo requested several times that his pastor be permitted to come inside to speak with him. Castillo was told that if he exited the house without anything in his hands, the Pastor and Garcia would be available to speak to him.

At about 7:30 a.m., Castillo exited the house, and it was observed that he had a pistol in a holster attached to his belt. Shortly thereafter, he returned to the house, and after more negotiations he came outside. He then complied with police orders by showing his hands and lifting his shirt so that it could be determine if he had any weapons. No weapons were visible. Garcia asked Castillo to step away from the porch. At first, Castillo told Garcia that he had "14 seconds" to walk up to him and come into the house with him, or Castillo would return inside. Garcia told him that the police had complied with his earlier demands and that Garcia would speak to him if Castillo met him halfway in the font yard. Castillo complied by moving into the front yard and was approximately 15 feet from the door when he observed the SWAT officers staged next door. Castillo then became upset and agitated upon seeing the SWAT officers.

At this point, some of the facts are in dispute. Lehocky contends that Castillo threatened the officers by stating that he had a gun and "it is going to get bad." [Doc. 98, p. 14.] After seeing the SWAT team in place, Castillo supposedly was waving his hands, yelling at the officers and challenging them. [Id., p. 15.] Lehocky further asserts that Castillo, "through his demeanor and his actions, lead the police to believe that he would reenter his house and arm himself." If Castillo were to return to the house where he had weapons, the danger to himself, the officers, and the public would dramatically increase.

Accordingly, Lehocky believed it was necessary to stop Castillo from returning to his house. Castillo, however, testified that he did not turn to return to his house. The accounts of different officers vary as to whether Castillo turned back or moved towards the house.

Purportedly to prevent Castillo from re-entering the house and re-arming himself, the following facts are uncontested: Lehocky commanded police

service dog ("PSD") Bart to detain Castillo; Bart pulled Castillo to the ground and bit him on his right ankle; Castillo was unarmed when apprehended; he was about 15 feet from the door of his house; Castillo was not facing his home and not known to be walking backwards toward his home; and no canine warnings were given before deploying Bart. [Doc. 103, undisputed fact nos. 19-24.]

Castillo contends that the use of the dog was objectively unreasonable, based on the circumstances alleged, and in violation of his Fourth Amendment rights to be free from the use of excessive force. In contrast, Lehocky asserts that it was objectively reasonable to deploy a PSD when the officers had reason to believe that Castillo would return to his house and re-arm himself.

According to Lehocky, the officers' decision to apprehend Castillo with a PSD was constitutional based on the officers' belief that Castillo posed a danger to himself and possibly others.

Summary Judgment Standard

A court should grant summary judgment only if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The Supreme Court has observed that a genuine issue of material fact exists where "the evidence is such that a reasonably jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505 (1986). Initially, the moving party carries the burden of establishing that "there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548 (1986). The burden then shifts to the party opposing the motion who must come forward with evidence, beyond mere allegations or denials of the pleadings, which shows that a genuine issue of material fact exists. Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991). In deciding a motion for summary judgment, courts should "examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment." Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990).

Discussion

I. QUALIFIED IMMUNITY

Lehocky first contends that he is entitled to summary judgment on grounds of qualified immunity. The United States Supreme Court recently reiterated that "[q]ualified immunity is `an entitlement not to stand trial or face the other burdens of litigation.' Mitchell v. Forsyth, 472 U.S. 511, 526, 105 S.Ct. 2806 (1985). The privilege is `an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial.' Saucier v. Katz, 533 U.S. 194, 200-01, 121 S.Ct. 2151, 2156 (2001) (internal citation omitted) (emphasis in original). The Supreme Court has "repeatedly . . . stressed the importance of resolving immunity questions at the earliest possible stage in litigation." Id. (internal citation omitted). Qualified immunity "operates . . . to protect officers from the sometimes `hazy border between excessive and acceptable force,' . . . and to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful." Id., at 206, 121 S.Ct. at 2158. Summary judgment motions involving a qualified immunity defense are determined somewhat differently than other summary judgment motions. Romero v. Fay, 45 F.3d 1472, 1475 (10th Cir. 1995). When a defendant raises the defense of qualified immunity in a summary judgment motion, the burden shifts to the plaintiff to meet a strict two-part test. Nelson

v. McMullen, 207 F.3d 1202, 1206 (10th Cir. 2000). The first part of the inquiry is: "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" Saucier, 533 U.S. at 201, 121 S.Ct. at 2156 (internal citation omitted). If the court determines that the allegations do not establish the violation of a constitutional right, no further inquiry need be taken and summary judgment based on qualified immunity is appropriate. Id.

Here, this first portion of the qualified immunity inquiry is conceded by Lehocky. In other words, Lehocky agreed, for purposes of his motion, that Castillo's allegations that the deployment of Bart violated Castillo's Fourth Amendment right against excessive force was sufficient to satisfy part one of the inquiry. [Doc. 98, p. 4.] See Graham v. Connor, 490 U.S. 386, 109 S.Ct. 1865 (1989) (holding that the use of force, if excessive under objective standards of reasonableness, is contrary to the Fourth Amendment).

The next sequential step of the qualified immunity inquiry is whether the right was clearly established. Saucier, 533 U.S. at 201, 121 S.Ct. at 2156. "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Id. at 202, 121 S.Ct. at 2156. This inquiry is determined in the specific context of the case, rather than as a broad general proposition. Id. With respect to whether the law was clearly established, the plaintiff need only show that the alleged unlawfulness was apparent in light of preexisting law.

Typically, there must be a Supreme Court or Tenth Circuit decision on point to find that a law was clearly established. Medina v. City & County of Denver, 960 F.2d 1493, 1498 (10th Cir. 1992). If the plaintiff establishes both elements of the test, the defendant then bears the traditional burden of showing no material issues of fact remain that would defeat the claim of qualified immunity. Fay, 45 F.3d at 1475.

Qualified immunity "grants `officers immunity for reasonable mistakes as to the legality of their actions,' and in excessive force cases, `in addition to the deference officers receive on the underlying constitutional claim, qualified immunity can apply in the event the mistaken belief was reasonable." Holland v. Harrington, 268 F.3d 1178, 1196 (10th Cir. 2001) (internal citations omitted), cert. denied, 122 S.Ct. 1914 (2002). "The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct." A legal mistake may be reasonable where the circumstances "disclose substantial grounds for the officer to have concluded he had legitimate justification under the law for acting as he did." Id. (internal citation omitted).

To the extent that courts previously concluded that the qualified immunity inquiry was duplicative in an excessive force case (or had merged with the underlying Fourth Amendment merits analysis), the Supreme Court, in Saucier, clarified that the inquiries for qualified immunity and excessive force remain distinct. Saucier, 533 U.S. at 204, 121 S.Ct. at 2158. The qualified immunity inquiry has a further dimension, in that if an officer makes a reasonable mistake as to what the law requires then he or she is still entitled to the immunity defense. Id. at 205, 121 S.Ct. at 2158. See Stuart v. Jackson, 24 F.3d. Appx. 943, 953, 2001 WL 1600722 at *8 (10th Cir. Dec. 17, 2001) (in contrast with the underlying Fourth Amendment analysis that "focuses on the reasonableness of the officer's actions, the qualified immunity analysis probes whether officer's belief in the state of the law was reasonable.") (emphasis in original, but modified).

The Court examines the circumstances that faced the officer at the moment in question, not with 20/20 hindsight. Moreover, the Court recognizes, as it must, that "police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain and rapidly evolving — about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 397, 109 S.Ct. at 1872. However, summary judgment on qualified immunity grounds is not appropriate when there are facts in dispute that are material to a determination of reasonableness. Thomas v. Roach, 165 F.3d 137, 143 (6th Cir. 1999); see Kaspar v. City of Hobbs, 32 Fed. Appx. 521, 523, 2002 WL 481556 at *2 (10th Cir. Apr. 1, 2002) (even if caretaker had authority to consent to search, disputed issues of fact as to whether caretaker gave consent to officers precluded a grant of qualified immunity); Pray v. City of Sandusky, 49 F.3d 1154, 1161 (6th Cir. 1995) (summary judgment on qualified immunity unavailable "if there are factual disputes involving an issue on which the question of immunity turns, `such that it cannot be determined before trial whether the defendant did acts that violate clearly established rights'") (internal citation omitted); Ting v. Untied States, 927 F.2d 1504, 1511 (9th Cir. 1991) (qualified immunity cannot be decided in light of the factual conflict surrounding shooting incident, because a jury could reasonably conclude that it would not be reasonable for an officer to believe his use of force was lawful under the plaintiff's version of events); Jackson v. Hoylman, 933 F.2d 401, 403 (6th Cir. 1991) (parties disputed "virtually all of the essential facts surrounding the excessive force claim"; "[a]ssuming the law is clearly established that a police officer may not use excessive force in effecting an arrest, it is impossible to determine, without choosing between the parties' sharply different factual accounts, whether the force the officer used, objectively assessed, was reasonable.") Compare Saucier, 533 U.S. at 208, 121 S.Ct. at 2160 (qualified immunity granted where key underlying facts were not in dispute).

Here, had Castillo and the officers all agreed that Castillo made some kind of motion or indication of returning to his house, Lehocky, most likely, would be entitled to a cloak of qualified immunity. See Kaspar v. City of Hobbs, 90 F. Supp.2d 1313, 1320 (D.N.M. 2000) (issue of whether officers acted reasonably would have been mooted by the fact that the caretaker had actual authority to consent to a search of the plaintiff's home). However, the problem in deciding qualified immunity, based on these circumstances, is that the critical fact of whether Castillo did or did not turn to his house, is sharply disputed by the parties. Thus, the Court cannot reach a determination as to whether there were "substantial grounds for [Lehocky] to have concluded he had legitimate justification under the law for [sending the dog.]" See Holland, 268 F.3d at 1197. In other words, if everyone agreed that Castillo made some movement to return to his home, then there would be substantial grounds for Lehocky to have deployed Bart. If, on the other hand, Castillo did not turn towards his house it would not have been objectively reasonable for Lehocky to conclude that sending the dog at Castillo was lawful under the constraints of the Fourth Amendment. This is true because if Castillo did not indicate that he was returning to his house, there would be no demonstrable evidence that he posed a significant threat of death or serious bodily injury to anyone since he was unarmed and surrounded by many officers in his front yard.

Moreover, the fact that the officers are not consistent among themselves as to what type of motion Castillo did or did not make towards his house, further supports the finding that a genuine issue of material fact exists for trial. For example, Officer Charlie Lopez, who made the actual decision to release Bart testified that Castillo had "started to turn to move toward the direction to reenter his house." [Lopez Dep., p. 23-24, attached as Ex. 2 to Castillo's response.] Lopez further testified that

Castillo "was turning in a quick manner to head back in the house." "He had actually taken a step or two" [towards his house]. [Id. at 26.] Sergeant Hill testified that he did not know if Castillo made a full turn to the house, but that it was "just a half step back, and he starts walking backwards to his house." [Hill Dep. at p. 22-23, attached as Ex. 3 to Castillo's response.] Hill then was asked if Castillo "actually started to walk backwards or turned towards the house" and he responded "Yes, ma'am." [Id. at 23.] Officer Schaller testified that when Castillo stopped walking towards Garcia he did not then turn to return to his house. [Schaller Dep. at 34, attached as Ex. 4 to Castillo's response.] Lehocky was asked if Castillo was walking backwards to the house before the dog was deployed, and he stated "I couldn't determine whether he was walking backwards." [Lehocky Dep. at 75, attached as Ex. 6 to Castillo's response.] Finally, Castillo testified that he did not turn to go back to his house. [Castillo Dep. at 203, attached as Ex. 5 to Castillo's response.] See Wilson v. City of Des Moines, ___ F.3d ___, 2002 WL 1251990 at *1, 5-6 (8th Cir. June 7, 2002) (internal discrepancies and variations in officers' testimony as to "crucial last moments of their encounter" with the plaintiff raised genuine issue of material fact about reasonableness of what the officer did, and therefore, trial court's denial of qualified immunity was appropriate).

For all of these reasons the Court concludes that Lehocky's request for qualified immunity will be denied.[fn3]

## II. EXCESSIVE FORCE/FOURTH AMENDMENT CLAIM

Lehocky contends that he is entitled to summary judgment on the excessive force claim, even if Castillo can defeat his request for qualified immunity. Lehocky sets out the key inquiry as being "whether the officers' actions are `objectively reasonable' in light of the fact and circumstances confronting them. . . ." Graham, 490 U.S. at 397. The reasonableness determination requires "careful attention to the facts and circumstances of each particular case." Id. at 396. Lehocky argues that the undisputed material facts show that his decision to deploy Bart was objectively reasonable under the circumstances he faced. [Doc. 98, p. 24.] Castillo also seeks summary judgment against Lehocky in Castillo's cross motion, claiming that the undisputed material facts demonstrate a violation of Castillo's Fourth Amendment rights. [Doc. 103, pp. 6-9.]

The Supreme Court explained that "[i]f an officer reasonably, but mistakenly, believed that a suspect was likely to fight back, for instance, the officer would be justified in using more force than in fact was needed." Saucier, 533 U.S. at 205, 121 S.Ct. at 2158. "[T]he essence of the Graham objective reasonableness analysis" is that "`[t]he force which was applied must be balanced against the need for that force: it is the need for force which is at the heart of the Graham factors.'" Headwaters Forest Defense v. County of Humboldt, 276 F.3d 1125, 1130 (9th Cir. 2002) (internal citations omitted), pet. for cert. filed May 24, 2002. The reasonableness of the officer's actions is dependent upon the plaintiff's actions. Wilson, ___ F.3d ___, 2002 WL 1251990 at *3.

Here, Castillo's actions immediately preceding the deployment of Bart are in dispute. Thus, under these circumstances, the Court cannot make the determination of whether it was reasonable or unreasonable for Lehocky to believe that Castillo was about to return to his house to re-arm himself. Whether Lehocky's reasonably believed that Castillo was turning to return to his house and/or whether Lehocky made a reasonable mistake of fact will depend on a jury's resolution of the disputed facts, the inferences it draws from the testimony, and its assessment of the witnesses' credibility.

## Conclusion

For all of the above-stated reasons, the cross-motions for summary judgment will be denied.

IT IS THEREFORE ORDERED that:

(1) Lehocky's Motion for Partial Summary Judgment No. V: Dismissal of Plaintiff's Entire Fourth Amendment Excessive Force Claim on the Basis of Qualified Immunity [doc. 97] is DENIED; and

(2) Castillo's Motion for Summary Judgment as to Defendant Andrew Lehocky [doc. 102] is DENIED.

[fn1] This argument is improper for two reasons. First, the evidentiary rule relied on is simply not applicable. Rule 106 provides that "the opponent, against whom a part of an utterance [or writing] has been put in," may in turn complement it by putting in the remainder, in order to secure for the tribunal a complete understanding of the total tenor and effect of the utterance." Echo Acceptance Corp. v. Household Retail Services, Inc., 267 F.3d 1068, 1089 (10th Cir. 2001) (internal citation omitted) (emphasis in original). The purpose of the rule is to protect against the admission of potentially misleading evidence. Id. "The rule is protective, merely." Id. (internal citation omitted). In other words, application of Rule 106 typically arises during trial in the context of determining whether part of an exhibit may be introduced or whether all of it must be introduced. However, "[t]he rule does not allow a party to introduce otherwise inadmissible hearsay on the coattails of its own or stipulated exhibits," id., which is what Lehocky appears to attempt here by asserting that if some of his contentions in the IPTR are taken as true, then all of them must be accepted. In addition, Castillo's reliance on Rule 106 is improper under these circumstances because Castillo does not concede that all of the contentions in the IPTR are true. Clearly, the parties continue to dispute key assertions. Finally, the Court has not located any published case law that applies Rule 106 to the Rule 56 summary judgment stage.

[fn2] Lehocky's attorney also attempts to incorporate portions of the officers' depositions that were not relied upon or cited by Castillo. Lehocky explains that while he will stipulate to the accuracy of the deposition testimony relied upon by Castillo, the rule of completeness requires that other portions of these depositions be considered as well, since Castillo "used the testimony in a manner that favored [Castillo's] position and omitted facts which supported the reasonableness" of the officers' actions. [Doc. 104, p. 9.] Again, the Court does not find that Rule 106 is applicable under these circumstances; instead, Lehocky's maneuvering appears to be an attempt to avoid acknowledging that there are material facts in dispute that prevent summary disposition of this case.

[fn3] The Court notes that the Tenth Circuit has made clear that where issues of fact, rather than law, preclude a determination that a defendant is entitled to qualified immunity, an order denying qualified immunity is not final and is not appealable. Kaspar v. City of Hobbs, 2002 WL 481556 at *1. In this case, issues of fact preclude the Court from determining whether Lehocky should be granted immunity.

Copyright © 2004 Loislaw.com, Inc. All Rights Reserved